United States Court of Appeals
Fifth Circuit

**F I L E D**

**February 13, 2007**

Charles R. Fulbruge III
Clerk

**UNITED STATES COURT OF APPEALS**
**FIFTH CIRCUIT**

————————

No. 05-11486

————————

GREGORY D WILLIAMS,

Plaintiff - Appellant,

versus

DALLAS INDEPENDENT SCHOOL DISTRICT,

Defendant - Appellee.

————————————————————————————————

Appeal from the United States District Court
For the Northern District of Texas
USDC No. 3:04-CV-1386

————————————————————————————————

Before KING, GARZA, and PRADO, Circuit Judges.

PER CURIAM:[*]

Gregory Williams appeals the district court's grant of summary judgment in favor of his

former employer, Dallas Independent School District ("DISD"), on his claim that DISD retaliated

against him for engaging in speech protected by the First and Fourteenth Amendments. We affirm.

---

[*]      Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not
be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R.
47.5.4.

I

Gregory Williams was previously employed as Athletic Director and Head Football Coach at Pinkston High School in the DISD. During the months leading up to the 2003 school year, Williams repeatedly asked the school's office manager for information concerning the funds appropriated for athletic activities. Despite numerous requests, the office manager did not give Williams specific information on the athletic account. In late September of that year, Williams wrote a memorandum to the office manager (copied to the school principal, J.L. Wright) in which he protested the manager's "fail[ure] to provide [him] with any information and/or balance pertaining to th[e athletic] account." Also in this letter, he questioned as "extremely unusual" a previous incident when the office manager casually informed him that the athletic account had a negative balance even though it had been credited with $1,000 for football season, and he had charged only one $165 purchase against that account. Williams concluded his letter to the office manager with, "Your failure to provide me with and [sic] account balance, despite numerous requests, has hurt my ability to provide our student/athletes with critical items and/or materials necessary for competition."

Almost two months later, Williams wrote a memorandum to principal Wright, expressing further concern regarding the handling of school athletic funds. Williams wrote:

> This memorandum is with reference to gate receipts generated through athletic events held here at L.G. Pinkston High School.
>
> As an experienced coach with Dallas Independent School District, I am very familiar with the standard operating procedures utilized at the majority of the high school campuses in this district. I have also gone a step further by communicating with Coach Goree Johnson, Assistant AD DISD, Coach Elsie Moreno, Assistant AD DISD and Coach Calvin Portly, Assistant AD DISD on yesterday, November 19, 2003. These individuals confirmed my original understanding of what standard operating

procedure is at the majority of the high school campuses.

Typically, all gate receipts generated for non-district events held on campus or at one of the field houses are deposited into the "General Athletic Account." In this instance that would be Account #101. This general athletic account is then utilized to provide supplemental funding for all sports. Which means these gate revenues should be used to help fund all of our basketball teams, girls and boys.

At the present time, our varsity boys have 2 (two) upcoming tournaments, which require entry fees. Our freshmen boys' basketball team is scheduled to participate in a tournament this weekend, which requires an entry fee be paid immediately. The varsity girl's basketball team receives the total gate revenues from their scrimmage game held here last week. This was considered a "fund raiser" for the basketball program. The scrimmage game generated over $200.00. The gate revenues from this weeks [sic] games were earmarked for tournament entry fees for our boys teams.

I am attempting to operate the athletic department based on standard operating procedures and norms throughout the State of Texas. However, I have found that there is a network of friends and house rules, which govern practices here at L.G. Pinkston High School. As a result, Coach Calahan was permitted to deposit an additional $200.00 into the girls [sic] account. Therefore, I will advise the other basketball coaches that the athletic account #101 will not be able to support their entry fees as originally planned.

Four days after receiving the memorandum, principal Wright removed Williams as Athletic Director. Removal as Athletic Director was elevated to emergency removal and administrative leave. In early March, DISD decided not to renew Williams's contract. Later that month, DISD placed principal Wright and the office manager on administrative leave pending an investigation of matters including "financial accountability."

Wright sued in the district court under 42 U.S.C. § 1983, alleging that DISD removed him as Athletic Director in retaliation for engaging in speech protected by the First and Fourteenth Amendments. The district court granted summary judgment in favor of DISD, holding that Williams's memorandum to principal Wright did not "address a matter of public concern" and therefore did not receive First Amendment protection. Williams appeals.

II

We review a grant of summary judgment *de novo*. *Honeywell Int'l, Inc. v. Phillips Petroleum Co.*, 415 F.3d 429, 434 (5th Cir. 2005). We affirm only when there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. *Id.* We may affirm a summary judgment on any ground supported by the record, even if it is different from that relied on by the district court. *Holtzclaw v. DSC Commc'ns Corp.*, 255 F.3d 254, 258 (5th Cir. 2001) (*citing Tex. Refrig. Supply, Inc. v. FDIC*, 953 F.2d 975, 980 (5th Cir. 1992)).

III

Public employees do not surrender all their free speech rights by reason of their employment. Rather, the First Amendment protects a public employee's right, in certain circumstances, to speak as a citizen on matters of public concern. *See, e.g.*, *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968); *Connick v. Myers*, 461 U.S. 138, 147 (1983); *United States v. Nat'l Treasury Employees Union*, 513 U.S. 454, 466 (1995). At the same time, "[t]his prospect of [First Amendment] protection . . . does not invest them with a right to perform their jobs however they see fit." *Garcetti v. Ceballos*, 126 S. Ct. 1951, 1960 (2006). The relationship between the speaker's expressions and employment is a balancing test. A public employee's speech is protected by the First Amendment when the interests of the worker "as a citizen in commenting upon matters of public concern" outweigh the interests of the state "as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering*, 391 U.S. at 568.

Williams claims that the memoranda he submitted to the office manager and principal are speech protected by the First Amendment. He argues that his memoranda are identical to that in

-4-

*Pickering v. Board of Education*, where a teacher's letter to the local newspaper protesting the manner in which his school distributed funds between athletic and academic programs was held to be protected speech. *Id.* Williams views himself as engaging in a similar crusade against misappropriated and discriminatory funding, specifically pointing out that the girls' basketball team received $200 in special proceeds that should have gone to the general fund and that money was mysteriously missing from the athletic account. Claiming to have written the memoranda as a "taxpayer" and a "father," Williams notes that his efforts were later vindicated when principal Wright and the office manager were removed from their positions.

Williams's reliance on *Pickering*, however, is now inapposite. The Supreme Court's recent pronouncement in *Garcetti v. Ceballos* added a threshold layer to the *Pickering* balancing test. 126 S. Ct. at 1951. Under *Garcetti*, we must shift our focus from the content of the speech to the role the speaker occupied when he said it. Emphasizing the distinction between a speaker acting in her role as "citizen" and her role as "employee," *Garcetti* held that the First Amendment does not protect "expressions made pursuant to their official duties." *Id* at 1960. Even if the speech is of great social importance, it is not protected by the First Amendment so long as it was made pursuant to the worker's official duties. *Id.* at 1960.

*Garcetti* did not explicate what it means to speak "pursuant to" one's "official duties," although we do know that a formal job description is not dispositive, *id.* at 1961, nor is speaking on the subject matter of one's employment. *Id.* at 1959. Thus, in order to determine whether Williams wrote these memoranda pursuant to his responsibilities as Athletic Director, we must also look to the facts and rationale underlying *Garcetti*.

*Garcetti* involved a claim brought by a deputy district attorney, Richard Ceballos, who

worked for the Los Angeles County District Attorney's office. *Id.* at 1955. When a defense attorney told Ceballos that he had found inaccuracies in an affidavit supporting a search warrant, Ceballos looked into the matter and concluded that defense counsel was right. *Id.* at 1956. He communicated his concerns to his supervisors and wrote memoranda suggesting that the office refrain from prosecuting the crime; however, Ceballos's supervisors disagreed and decided to proceed with the prosecution. *Id.* Ceballos claimed that, in response to his memoranda, he was subjected to a series of retaliatory actions, including reassignment, transfer to another location, and denial of a promotion. *Id.* The Supreme Court held that Ceballos's memoranda were not protected speech, reasoning:

> The controlling factor in Ceballos' case is that expressions were made pursuant to his duties as a calendar deputy . . . . That consideration—the fact that Ceballos spoke as a prosecutor fulfilling a responsibility to advise his supervisor about how best to proceed with a pending case—distinguishes Ceballos' case from those in which the First Amendment provides protection against discipline. We hold that when public employees make statements *pursuant to their official duties*, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline.

*Id.* at 1959-60 (emphasis added).

In *Garcetti*, Ceballos was acting pursuant to his official duties because he was performing activities *required* to fulfill his duties as a prosecutor and calendar deputy that were not protected by the First Amendment. A prosecutor is hired to assess search warrants and write recommendations on when to exercise prosecutorial discretion. *Cf. Brady v. Maryland*, 373 U.S. 83 (1963). Thus, when Ceballos articulated his opinion about a case in a memorandum to his supervisor, alleging that the police acted inappropriately in gathering evidence, he did exactly what he was required to do. The fact that his memorandum implicated contentious political issues important to the public, such as police corruption and prosecutorial misconduct, was irrelevant to the threshold inquiry. Job-

-6-

required speech is not protected.

In the instant case, DISD concedes that an Athletic Director is not required to write memoranda to his principal regarding athletic accounts. Thus, we must determine the extent to which, under *Garcetti*, a public employee is protected by the First Amendment if his speech is not necessarily required by his job duties but nevertheless is related to his job duties.

The Supreme Court's prior decisions afford some guidance here. Notably, the Court distinguished Ceballos's speech from that of schoolteachers Marvin Pickering and Bessie Givhan. Pickering engaged in protected speech when he wrote a letter to a local newspaper addressing the funding policies of his school board. *Pickering*, 391 U.S. at 563. Givhan could not be fired for complaining to her principal about the school's discriminatory hiring practices. *Givhan v. Western Line Consol. Sch. Dist.*, 439 U.S. 410 (1979). In another context, a district attorney's questionnaire asking her colleagues whether they felt pressure to work on political campaigns was protected speech, while the portions of the questionnaire soliciting her colleague's views on office morale, the policy of transferring employees, the need for a grievance committee, and the level of confidence in her superiors were not protected. *Connick*, 461 U.S. at 138.

These cases, when viewed as a whole, distinguish between speech that is "the kind of activity engaged in by citizens who do not work for the government," *Garcetti*, 126 S. Ct. at 1962, and activities undertaken in the course of performing one's job. Activities undertaken in the course of performing one's job are activities pursuant to official duties. *Id.* at 1960. Other circuits have drawn similar conclusions from *Garcetti* and those cases preceding it. *See, e.g.*, *Freitag v. Ayers*, 468 F.3d 528 (9th Cir. 2006) (holding as not protected speech a prison guard's internal complaints documenting her superior's failure to respond to inmates' sexually explicit behavior toward her);

-7-

*Battle v. Bd. of Regents*, 468 F.3d 755, 761 (11th Cir. 2006) (construing a university employee's report which alleged improprieties in her supervisor's handling and management of federal financial aid funds as "pursuant to her official employment responsibilities" and thus not protected speech); *Mills v. City of Evansville*, 452 F.3d 646, 648 (7th Cir. 2006) (finding unprotected speech when a police officer made negative remarks following an official meeting to discuss plans to reorganize the department because the remarks were made "in her capacity as a public employee contributing to the formation and execution of official policy.").

We must therefore decide whether Williams wrote his memoranda in the course of performing his job as Athletic Director. Williams's statements in his memoranda focus on his daily operations. He needed information regarding the athletic account so that he could "operate the athletic department based on standard operating procedures and norms throughout the State of Texas." He accused the office manager of "hurt[ing his] ability to provide . . . student/athletes with critical items and/or materials necessary for competition." Moreover, Williams was responsible for buying sports equipment and for arranging and paying tournament fees. Because the office manager and principal were in charge of allocating and monitoring the athletic accounts (Williams obviously did not have exclusive control of the accounts), in order for Williams to purchase equipment and enter competitions, he needed to consult with his superior about his budget.[1] We thus find that Williams's speech was made in the course of performing his employment.[2]

---

[1]     We do not find dispositive the fact that Williams's statements were made internally. *See Garcetti*, 126 S. Ct. at 1959; *Givhan*, 439 U.S. at 410.

[2]     This is not a case where Williams wrote to the local newspaper or school board with his athletic funding concerns. *See Garcetti*, 126 S. Ct. at 1960 ("Contrast, for example, the expressions made by the speaker in *Pickering*, whose letter to the newspaper had no official significance and bore similarities to letters submitted by numerous citizens every day.").

Simply because Williams wrote memoranda, which were not demanded of him, does not mean he was not acting within the course of performing his job. He needed account information so that he could properly execute his duties as Athletic Director, namely, taking the students to tournaments and paying their entry fees. The memoranda were not written from Williams's perspective as a "father" and "taxpayer." Unlike Pickering, whose "position as a teacher in the district did not qualify him to speak with any greater authority than any other taxpayer," *Pickering*, 391 U.S. at 1736, Williams had special knowledge that $200 was raised at a basketball tournament. He was also experienced with standard operating procedures for athletic departments. Even his language accusing the principal of engaging in a "network of friends and house rules" was part-and-parcel of his concerns about the program he ran.

We thus hold that Williams's memoranda to the office manager and principal Wright were written in the course of performing his job as Athletic Director; thus, the speech contained therein is not protected by the First Amendment.

IV

Accordingly, we AFFIRM the district court's grant of summary judgment.