Kevin HEFFERNAN, Plaintiff,

v.

Frank G. STRAUB, individually and in his capacity as Commissioner of Public Safety for the City of White Plains, New York; Richard Lyman, individually and in his capacity as Chief of the City of White Plains Fire Bureau, Department of Public Safety; Richard Houlihan, individually and in his capacity as Deputy Chief, White Plains Fire Bureau, Department of Public Safety; Vincent Roberto, individually and in his capacity as Deputy Fire Chief, White Plains Fire Bureau, Department of Public Safety; and City of White Plains, New York, Defendants.

No. 07 Civ. 11260 (WCC).

United States District Court, S.D. New York.

March 30, 2009.

Kim Berg, Esq., of Counsel Lovett & Gould, White Plains, NY, for Plaintiff.

Ivan D. Smith, Esq., Maureen M. Stampp, Esq., Sabrina Tann, Esq., of Counsel, Lewis Brisbois Bisgaard & Smith, LLP, New York, NY, for Defendants.

### OPINION AND ORDER

WILLIAM C. CONNER, Senior District Judge.

Plaintiff Kevin Heffernan ("plaintiff") brings this action against Frank G. Straub ("Straub"), individually and in his capacity as Commissioner of the Department of Public Safety for the City of White Plains, New York; Richard Lyman ("Lyman"), individually and in his capacity as Chief of the City of White Plains Fire Bureau, Department of Public Safety; Richard Houlihan ("Houlihan"), individually and in his capacity as Deputy Chief, White Plains Fire Bureau, Department of Public Safety; Vincent Roberto ("Roberto"), individually and in his capacity as Deputy Fire Chief, White Plains Fire Bureau, Department of Public Safety; and the City of White Plains, New York (the "City" and, together with Straub, Lyman, Houlihan and Roberto, "defendants"). Plaintiff alleges that defendants preferred baseless disciplinary

charges against him in retaliation for plaintiffs exercise of his First Amendment rights of speech and association.[1] Defendants now move for summary judgment. For the reasons set forth below, defendants' motion is granted insofar as the First Amendment claim is based on adverse action in response to radio transmissions on April 20, 2005 and defendants' motion is denied in all other respects.

## BACKGROUND

Unless otherwise indicated, the following facts are undisputed.

Straub is the Commissioner of the Department of Public Safety for the City, in which capacity he oversees the City's Fire Bureau ("Fire Bureau"), Police Department and Emergency Medical Services. (Defs. R. 56.1 Stmt. ¶¶ 2–3.) Lyman has been the Chief of the Fire Bureau (the "Fire Chief") since 2003 and, in that position, he manages the Fire Bureau's budget and oversees the various divisions of the Fire Bureau. (Id. ¶¶ 5–6.) Plaintiff has been a lieutenant in the Fire Bureau since 1993. (Id. ¶ 7.) The job specifications of a lieutenant in the Fire Bureau provide that he, *inter alia*, " 'has responsible charge of the activities of a fire company [and] protects life and property by performing fire fighting duties.' " (Defs. R. 56.1 Stmt. ¶ 8.)[2] Houlihan has been a deputy chief in the Fire Bureau since 2004; in April 2005, he was the "day deputy," in which position his duties included "overseeing training, fire prevention, special projects and Haz-

mat." (Id. ¶¶ 9–10.) In April 2005, Roberto was a deputy chief in the Fire Bureau and managed a staff of 36 to 38 people; his job duties included "responding to fires and directing the fire companies under his supervision in saving lives and property."[3] (Id. ¶¶ 11–12.) Charles R. Jennings ("Jennings") was a first deputy commissioner of the City's Department of Public Safety from October 2002 to January 2008 and, in that capacity, his duties included "oversight of the Department of Public Safety's budget ... and oversight of the Fire Bureau on a day to day basis." (Id. ¶¶ 13–14.) Lawrence Toglia ("Toglia") has been a lieutenant in the Fire Bureau since 1997. (Id. ¶ 15.)

The White Plains fire fighters are represented by the Professional Fire Fighters Association, Inc., Local 274, I.A.F.F., AFL–CIO (the "Union"). (Id. ¶ 16.) Joseph Carrier ("Carrier") is the President of the Union and plaintiff is both the Vice President and the "duly appointed chairman of the Union's Health and Safety Committee." (Id. ¶¶ 17–18.)

The Fire Bureau operates through a chain of command, with the Fire Chief at the top and, beneath him, the deputy chiefs, followed by the lieutenants, and then by the fire fighters. (Id. ¶ 25.) The "Fire Bureau fire suppression team" is organized into four groups, with each group lead by a deputy chief. (Id. ¶ 26.) Plaintiff is assigned to "Group 3," of which group Roberto is the deputy chief in command and, therefore, plaintiff, as a lieuten-

---

**1.** Plaintiff also claimed that defendants treated him disparately, in violation of the Equal Protection Clause of the Fourteenth Amendment. That claim has since been discontinued by a Partial Stipulation of Discontinuance and Order dated October 10, 2008. (Smith Aff., Ex. D.)

**2.** Plaintiff and defendants disagree as to whether the job description that defendants describe was in effect at the time during

which the events giving rise to the instant suit arose. Specifically, plaintiff argues that the words, the lieutenant shall "operate[ ] portable radio[s]" were added to the job description after the events described herein had already occurred. (Pl. R. 56.1 Counterstmt. ¶ 8.)

**3.** Roberto retired from the Fire Bureau in September 2008. (Id. ¶ 11.)

ant, "is obligated to follow Roberto's orders." (*Id.* ¶¶ 27–28.)

The Rules and Regulations for the Government of Officers and Members of the Bureau of Fire, Department of Public Safety for the City of White Plains, (the "Fire Bureau Rules and Regulations") set forth rules and procedures governing the conduct of certain Fire Bureau members, including fire lieutenants. (*Id.* ¶ 29.) The Fire Bureau Rules and Regulations provide, in part, that Fire Bureau members shall: (i) " '[d]evote their whole time on duty to the work of the Department' "; (ii) " '[p]romptly notify the Fire Alarm Dispatcher or Deputy Chief on duty of any inability to report for duty at the time or place required' "; and (iii) " '[p]romptly notify the Officer in Command of their Unit of any matter coming to their attention which may affect the interest or welfare of the Department.' " (*Id.* ¶ 30 (internal citation omitted; alterations in original).) As a fire lieutenant, plaintiff is subject to discipline if his conduct fails to comport with the requirements of the Fire Bureau Rules and Regulations. (*Id.* ¶ 31.) Plaintiff is also subject to discipline if he fails to follow an order issued by a deputy chief. (*Id.* ¶ 33.) Plaintiff, as a fire lieutenant, "has a duty to prepare his crew in a timely fashion to respond to a directive to go available" and a "duty to inform fire headquarters if his engine company is unable to respond to a call due to fatigue." (*Id.* ¶¶ 34–35.)

On April 20, 2005, the City conducted " 'live fire' training" involving fire fighters and equipment at the White Plains Drill School ("Drill School").[4] (*Id.* ¶ 36.) On that day, four of the City's nine fire engine companies "reported to duty, and were directed to the Drill School to perform live fire training." (*Id.* ¶ 37.) The four engine companies from the City were Tower Ladder 6, Engine 65, Engine 67 and Ladder 34; an engine company from the City of New Rochelle Fire Department was also present at Drill School that day. (*Id.*)

Tower Ladder 6, Engine 67 and Ladder 34 each had a three-man crew, consisting of one "lieutenant in charge" and two fire fighters. (*Id.* ¶ 38.) Engine 65 had a three-man crew, consisting of three fire fighters. (*Id.*) Togtia commanded Engine 67 and his crew included fire fighters Canute Hibbert and Jeffrey Faulkner; Lieutenant Fiorisi commanded Ladder 34 and his crew included fire fighters Anthony Evangelista and Brian McGarvey; and Engine 65 consisted of fire fighters James Russell, Patty Fitzgerald and Tommy Houlihan. (*Id.*) Plaintiff commanded Tower Ladder 6 and, at the Drill School, his crew included fire fighters Owen McCoy and Warren Fargo. (*Id.* ¶ 39.)

According to defendants, Lieutenant Ryan was "in charge of the live fire training at the Drill School" on April 20, 2005 and his "duties included overseeing the live burn, ensuring that the burn was set up correctly, providing the fire fighters with situational information about the simulation, and de-briefing the fire fighters after the simulation." (*Id.* ¶ 42.) Plaintiff, however, states that "either or even both [Lieutenant] Ryan and Deputy Chief Houlihan were in charge at [D]rill [S]chool on April 20, 2005." (Pl. R. 56.1 Counterstmt. ¶ 42.)

During the fire training, the engine companies completed "two evolutions of live fire training." (Defs. R. 56.1 Stmt. ¶ 43.) The first evolution consisted of an "interior burn in the Drill School smoke house" and,

4. "Live fire training consists of fire engine companies participating in simulated fire fighting and rescue exercises involving live fires[;] [t]he Drill School houses a specialized facility in which live fires can be lit and live fire training is conducted by engine companies." (*Id.* ¶ 36.)

during that evolution, Tower Ladder 6 was assigned "to perform fire fighter search and assistance." (*Id.*) This assignment required Tower Ladder 6 to "lay out tools and equipment and standby to intervene in case a fire [f]ighter went down" (*id.* ¶ 43) while wearing "full turn out gear." (Pl. R. 56.1 Counterstmt. ¶ 43.) At the conclusion of the first evolution, the fire fighters were given a break, which lasted between thirty and forty minutes, before the second evolution commenced. (Defs. R. 56.1 Stmt. ¶ 44.) For the second evolution, plaintiff was assigned to work with Engine 65. (*Id.* ¶ 45.) Engine 65 was "assigned to back up the engine company assigned to attack the fire by making sure that the fire did not get behind the attack crew." (*Id.*) At some point after the first evolution, Houlihan arrived at Drill School "to ensure that there were enough fire fighters to have a safe live fire burn[ ] and to observe the training." (*Id.* ¶ 46.)

Near the conclusion of the second evolution, a fire alarm sounded, indicating that a "real" fire had broken out at a residence on 10 Rose Street (the "Rose Street fire"). (*Id.* ¶ 47.) Plaintiff states that, at the time the alarm sounded, the firefighters at Drill School were still engaged in the second evolution. (Pl. R. 56.1 Counterstmt. ¶ 47.) During the Fire Bureau's response to the Rose Street fire, a series of radio transmissions were made among members of the Fire Bureau, including plaintiff, Roberto, the fire dispatcher and Houlihan. (Defs. R. 56.1 Stmt. ¶¶ 48–53.)

At approximately 1:08 p.m., the Fire Bureau received a report of "heavy smoke conditions at 10 Rose Street." (*Id.* ¶ 53.) Roberto, who was the "commanding officer in charge of mobilizing the Fire Bureau's response to the Rose Street fire alarm," stated that he "considered the Rose Street alarm to be significant." (*Id.* ¶¶ 54–55.) At 1:09 p.m., "dispatch deployed engine companies 66, 70 and 71, Ladder 32 and

Rescue 88 to 10 Rose Street in response to the alarm." (*Id.* ¶ 56.) At that point, "all of the City's nine engine[s] . . . were committed—either assigned to Rose Street or [at the Drill School]," (Pl. R. 56.1 Counterstmt. ¶ 57) and Roberto "needed the engine companies at the Drill School to become available so that they could cover additional alarms, if needed." (Defs. R. 56.1 Stmt. ¶ 57.) While the Fire Bureau was responding to the Rose Street fire, a second alarm sounded at 18 Colonial Road; the second alarm was "quickly determined to be an accidental set off of an alarm." (Pl. R. 56.1 Counterstmt. ¶ 57.)

" 'Going available' " requires an engine company to "gather [its] equipment to respond to an emergency." (Defs. R. 56.1 Stmt. ¶ 58.) Once an engine company's equipment is gathered, the engine company "boards its apparatus and activates a button that signals [to] the dispatcher that [its] apparatus is available to be dispatched to a location." (*Id.*) At 1:11 p.m., Roberto first ordered the engine companies at Drill School to "make themselves available." (*Id.* ¶ 59.) Houlihan, who was physically present at Drill School at that time, heard Roberto's initial order; however, plaintiff and defendants disagree as to whether Houlihan immediately told the engine companies at Drill School "to ready their apparatus to go available" (*id.* ¶ 60) or whether Houlihan waited for the engine companies "to take a short [break] and get some water" before he told the engine companies to "make themselves available." (Pl. R. 56.1 Counterstmt. ¶ 60.) According to plaintiff, he did not hear Houlihan's order regarding readying the engine companies' apparatus to go available until approximately 1:17 p.m. (*Id.* ¶ 61.)

Roberto issued two more orders, after the initial transmission at 1:11 p.m., to Drill School engine companies concerning their availability: (1) at 1:17 p.m., Rober-

to's second order was, "[h]eadquarters contact the units at [D]rill [S]chool. Get them available as soon as possible"; and (2) at 1:41 p.m., Roberto's third order was directed specifically to Tower Ladder 6 and was "[a]h drop the hose lines at ah [D]rill [S]chool, lock the gate behind ya and ah report with Engine 65 to Station 2." (Defs. R. 56.1 Stmt. ¶¶ 65–69.) According to plaintiff, the fire fighters at the Drill School did not hear the first two transmissions and, within five minutes of the third order, "Tower Ladder 6 indicated it was available." (Pl. R. 56.1 Counterstmt. ¶¶ 65, 69.)

Toglia, who had initially been assigned to Engine 67 that day, was reassigned to Engine 65 during the course of mobilization and was Engine 65's commanding officer at the time that it went available. (*Id.* ¶ 70.) Defendants state that Ladder 34, Engine 67, Engine 65 and Tower Ladder 6 went available at approximately 1:22 p.m., 1:24 p.m., 1:46 p.m. and 1:48 p.m., respectively. (Defs. R. 56.1 Stmt. ¶¶ 71–74.)[5] Tower Ladder 6 was the last company to appear on the radio log as having gone available, however, plaintiff states that Tower Ladder 6 "left [D]rill [S]chool before Toglia's crew (Engine 65)." (Pl. R. 56.1 Counterstmt. ¶ 74.) Plaintiff avers that the time at which an engine company left Drill School and the time at which such engine company went available did not necessarily occur simultaneously. (*Id.* ¶¶ 71–74.)

Plaintiff made ten radio transmissions during the course of his response to Roberto's "go available" directive, nine of which were made from his department-issued handheld radio and one of which was made from the Tower Ladder 6 apparatus. (Defs. R. 56.1 Stmt. ¶ 76.) The first two radio transmissions were made at 1:34

p.m., the second of which contained the message, " '10–4,' made in response to fire headquarter's request to Engine 65 to respond to the Rose Street fire as soon as the engine company was available." (*Id.* ¶¶ 77–78.) In plaintiff's third radio transmission, which occurred at 1:41 p.m., plaintiff stated, " '[e]ngine 65 to Headquarter[s]. Engine 65 we're still at White Plains [D]rill [S]chool. Unavailable.' " (*Id.* ¶¶ 80–81.) Plaintiff's fourth and fifth radio transmissions also occurred at 1:41 p.m., which were, respectively, " '[l]adder 6. Go ahead 12' " and " '10–4,' " which plaintiff said in response to Roberto's third order. (*Id.* ¶¶ 82–84 (alteration in original).) The dispatcher then questioned whether plaintiff was " 'back in service,' " to which plaintiff responded with the sixth radio transmission, " 'we're picking up now ah leaving [D]rill [S]chool. We'll be back in service shortly.' " (*Id.* ¶ 85.)

Plaintiff's seventh, eighth and ninth radio transmissions were made at 1:44 p.m. (*Id.* ¶¶ 86, 88.) The eighth radio transmission was " 'advise Rose Street Command that the four companies that were located at the White Plains [D]rill [S]chool are fatigued,' " to which the dispatcher responded, " 'ah [T]ower [L]adder 6 that part was broken up. You have firefighters that are fatigued? You need ah relocation?' " (*Id.* ¶¶ 87, 89.) In response to the dispatcher's response, plaintiff made his ninth radio transmission, which was " 'negative. 65 and Tower Ladder 6 will be responding back to Station 2 but the companies that were at [Drill School] are fatigued.' " (*Id.* ¶ 89.) At 1:48 p.m., plaintiff made his tenth radio transmission, wherein he stated, " 'Ladder 6 to Headquarters, Ladder 6 is available, returning from [D]rill [S]chool to Station 2.' " (*Id.* ¶¶ 91–92.)

5. Plaintiff states that the exact times are "unclear" from the record. (Pl. R. 56.1 Counterstmt. ¶¶ 71–74.)

Later that day, Jennings notified Straub that there had been a problem with the Fire Bureau's response to the Rose Street fire, that engine companies did not make themselves available in a timely manner and that he was going to investigate the delayed response. (*Id.* ¶ 104.) The Fire Bureau commenced an investigation into the events of April 20, 2005, focusing specifically on the "delayed response from Tower Ladder 6 and Engine 65 to the go available order." (*Id.* ¶ 105.) Pursuant to that investigation, Lyman directed Fire Bureau members who were involved in "the Drill School incident" to write a report detailing the events of that day. (*Id.* ¶ 106.) Jennings and Lyman reviewed the reports that Fire Bureau members submitted to them regarding that day, among which was a "handwritten report to Lyman" by plaintiff. (*Id.* ¶¶ 107–08.)

In May 2005, Jennings and Lyman, in the presence of Carrier, interviewed plaintiff regarding the events of April 20, 2005. (*Id.* ¶ 110.) At the beginning of the interview, Lyman read to plaintiff a statement that the pending investigation could "lead to [plaintiff's] suspension or dismissal." (*Id.* ¶ 111.) As a result of the investigation, the Fire Bureau preferred "disciplinary charges and specifications" solely against plaintiff and Toglia. (*Id.* ¶ 113.)

Seven disciplinary charges under the Fire Bureau's Rules and Regulations were brought against plaintiff, who was served with such charges on July 31, 2005. (*Id.* ¶¶ 114–16.) One of the charges was based on plaintiff's " 'inappropriate radio trans-

mission advising Rose Street command that [D]rill [S]chool companies are fatigued during a working fire.' " (*Id.* ¶ 117.) With the exception of the inappropriate radio transmission charge, which was preferred only against plaintiff, the City preferred the same charges against both Toglia and plaintiff. (*Id.*)

Carrier and Straub had discussions regarding possible settlement of the charges with both Toglia and plaintiff. (*Id.* ¶ 118.) Toglia settled his disciplinary charges by pleading guilty to one of the charges and forfeiting three days of pay. (*Id.* ¶ 119.) Straub, through Carrier, communicated to plaintiff an offer of ten days suspension, which offer plaintiff refused on the basis that he felt he was not guilty of any wrongdoing. (*Id.* ¶ 120.) The charges against plaintiff did not settle. (*Id.*)

The City's law department selected Robert J. Ponzini ("Ponzini") to be the hearing officer to preside over plaintiff's disciplinary hearing and, in accordance with that selection, by letter dated December 13, 2005, Straub designated Ponzini to be the hearing officer. (*Id.* ¶¶ 122–23.) Straub does not know Ponzini personally and had no input as to Ponzini's selection. (*Id.* ¶¶ 123–24.)

On November 15, 2005, prior to the adjudication of the disciplinary charges, plaintiff filed "Improper Practice Charges with the New York State Public Employment Relations Board," wherein he stated that his comment regarding the fatigued nature of the "Drill School companies" was not made in his capacity as a fire lieutenant.[6] (*Id.* ¶ 102.) The resolution of this

---

**6.** According to defendants, the collective bargaining agreement between the Union and the Fire Bureau provides for twenty-five "release days," during which "Union executive board members" may conduct Union business instead of performing their duties as Fire Bureau employees, provided that Carrier approves a request to use a release day and provided that Carrier then notifies the Fire

Bureau that the member is scheduled to use a release day. (*Id.* ¶ 100.) Plaintiff was on duty as a fire lieutenant on April 20, 2005 and not authorized to use release time. (*Id.* ¶ 101.) According to plaintiff, "[i]n practice, [U]nion officials tend to [U]nion business while on the job" and, as "health and safety chair," plaintiff "addressed health and safety concerns

letter, if any, has not been presented to the Court.

The disciplinary charges brought against plaintiff were adjudicated pursuant to § 75 of the New York State Civil Service Law in a hearing conducted before Ponzini at the City's public offices on December 13, 2005, January 23, 2006, May 8, 2006 and June 16, 2006. (Defs. R. 56.1 Stmt. ¶¶ 125–26.) During the hearing, plaintiff was represented by counsel and plaintiff offered witness testimony and exhibits. (*Id.* ¶ 126.) During the hearing, the City withdrew the charge relating to plaintiffs allegedly inappropriate radio transmission, leaving only charges relating "specifically to plaintiff's failure to prepare his engine company to respond to Roberto's order in a timely fashion." (*Id.* ¶¶ 127, 129.)

On December 13, 2005, Roberto gave sworn testimony at plaintiff's disciplinary hearing, during which he stated that "fire companies are expected to respond to alarms even when they are in training at the Drill School." (*Id.* ¶ 141.) On January 23, 2006, Houlihan gave sworn testimony at plaintiffs disciplinary hearing, during which he stated that, "the first two engine companies timely responded to Roberto's go available order, but that [plaintiff] and Toglia's engine companies did not respond to the order in a timely fashion." (*Id.* ¶ 142.) Also on January 23, 2006, Lyman gave sworn testimony at plaintiff's disciplinary hearing, during which he stated that "after conducting an investigation and interviewing Fire Bureau personnel who were at the Drill School, he learned two engine companies responded quickly to Roberto's go available order and two other companies took a lot longer than expected." (*Id.* ¶ 143.) On May 8, 2006, fire fighter Evangelista gave sworn testimony at plaintiffs disciplinary hearing, wherein he stated that "he was assigned to Ladder 34 at the Drill School," that "after the both on and off duty." (Pl. R. 56.1 Coun-

second training evolution, he felt tired but not overworked" and that "he did not complain to lieutenant Fiorisi about his physical condition." (*Id.* ¶ 144.) Also on May 8, 2006, fire fighter McGarvey, who was also assigned to Ladder 34 at the Drill School, gave sworn testimony at plaintiff's disciplinary hearing, wherein McGarvey stated that "physically he felt okay after the second training evolution" and "that he did not complain to lieutenant Fiorisi about his physical condition." (*Id.* ¶ 145.)

On April 23, 2007, Ponzini issued the "Hearing Officer's Report and Recommendations," wherein he made various findings of fact, sustained the charges against plaintiff and recommended a thirty-day suspension without pay. (*Id.* ¶ 146.) On April 24, 2007, Straub adopted the Hearing Officer's Report and Recommendations and issued a final administrative determination, which imposed upon plaintiff a thirty-day suspension, without pay, from April 26, 2007 to May 25, 2007. (*Id.* ¶ 147.) Plaintiff did not appeal the administrative determination, though the New York Civil Service Law provides for such an appeal. (*Id.* ¶¶ 148–49.)

## DISCUSSION

### I. *Legal Standard*

Summary judgment may be granted where there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. *See* FED. R.CIV.P. 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A fact is material only if, based on that fact, a reasonable jury could find in favor of the nonmoving party. *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. The burden rests on the movant to demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v.* terstmt. ¶ 100.)

*Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In deciding whether summary judgment is appropriate, the Court resolves all ambiguities and draws all permissible factual inferences against the movant. *See Anderson,* 477 U.S. at 255, 106 S.Ct. 2505. To defeat summary judgment, the nonmovant must go beyond the pleadings and "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The Court's role at this stage of the litigation is not to decide issues of material fact, but to discern whether any exist. *See Gallo v. Prudential Residential Servs., L.P.,* 22 F.3d 1219, 1224 (2d Cir.1994). Nevertheless, as one court explained:

> [S]ummary judgment must be granted against a party in instances when such party fails to adequately establish an essential element on which it bears the burden of proof. . . . The non-moving party may not rest upon unsubstantiated allegations, conclusory assertions or mere denials of the adverse party's pleading, but must set forth and establish specific facts showing that there is a genuine issue for trial. . . . A metaphysical or other whimsical doubt concerning a material fact does not establish a genuine issue necessitating a trial. . . . The mere existence of a scintilla of evidence supporting the non-movant's case is insufficient to defeat a motion for summary judgment.

*Brooks v. DiFasi,* 1997 WL 436750, at *2, 1997 U.S. Dist. LEXIS 11162, at *6–7 (W.D.N.Y. July 30, 1997) (internal quotation marks and citations omitted).

## II. *First Amendment Retaliation*

 To state a *prima facie* claim of First Amendment retaliation, a plaintiff must establish that: (1) his speech was constitutionally protected; (2) he suffered an adverse employment action; and (3) a causal connection exists between plaintiff's protected speech and the adverse employment action. *Washington v. County of Rockland,* 373 F.3d 310, 320 (2d Cir.2004). If a plaintiff establishes a *prima facie* case of First Amendment retaliation, a defendant still may avoid liability by demonstrating that he would have taken the same action in the absence of plaintiff's protected speech. *Heil v. Santoro,* 147 F.3d 103, 110 (2d Cir.1998). In the case at bar, plaintiff claims that defendants violated his First Amendment rights by preferring disciplinary charges against him in retaliation for two First Amendment activities: (1) his comments made by radio transmission on April 20, 2005; and (2) his membership in and activities on behalf of the Union. We will address each First Amendment activity separately.

### A. *Constitutionally Protected Speech: April 20, 2005 Radio Transmissions*

Defendants aver that the statements that plaintiff made through radio transmissions on April 20, 2005 are not constitutionally protected speech and that we should, therefore, dismiss plaintiff's First Amendment claim relating to such statements.

#### 1. *General Principles*

 Whether a public employee's speech enjoys First Amendment protection depends on: "(1) 'whether the employee spoke as a citizen on a matter of public concern' and, if so, (2) 'whether the relevant government entity had an adequate justification for treating the employee differently from any other member of the general public.'" *Ruotolo v. City of New York,* 514 F.3d 184, 188 (2d Cir.2008), quoting *Garcetti v. Ceballos,* 547 U.S. 410, 418, 126 S.Ct. 1951, 164 L.Ed.2d 689 (2006). The Supreme Court has recog-

nized that the state, when acting as an employer, "has interests ... in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general." *Pickering v. Bd. of Educ. of Twp. High Sch. Dist. 205*, 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968). In such cases, the goal is to balance "the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Id.* Whether an employee's speech touches on a matter of public concern is a question of law to be decided by a court, based on the "content, form, and context of a given statement, as revealed by the whole record." *Connick v. Myers*, 461 U.S. 138, 147–48, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983); *see also Piscottano v. Murphy*, 511 F.3d 247, 274 (2d Cir.2007).

In *Garcetti*, the Supreme Court addressed the issue of what it means for a public employee to speak as a "citizen." In that case Ceballos, a deputy district attorney, was told by a defense attorney that an affidavit used to obtain a search warrant in a pending case contained inaccuracies. *Garcetti*, 547 U.S. at 413, 126 S.Ct. 1951. Upon investigating the matter himself, Ceballos agreed. *Id.* at 414, 126 S.Ct. 1951. Ceballos informed his supervisors of his concerns about the accuracy of the affidavit and composed a memorandum recommending dismissal of the case. *Id.* Ceballos claimed that he subsequently suffered a series of retaliatory employment actions in response, including a reassignment, transfer and denial of promotion. *Id.* at 415, 126 S.Ct. 1951.

The Court ruled that Ceballos's speech was not protected by the First Amendment because he had spoken "pursuant to his duties as a calendar deputy." *Id.* at 421, 126 S.Ct. 1951. The Court held that "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Id.* Writing the memo at issue was simply "part of what [Ceballos], as a calendar deputy, was employed to do." *Id.* Under circumstances such as those, the Court reasoned, "[r]estricting speech that owes its existence to a public employee's professional responsibilities does not infringe any liberties the employee might have enjoyed as a private citizen. It simply reflects the exercise of employer control over what the employer itself has commissioned or created." *Id.* at 421–22, 126 S.Ct. 1951. Mindful of the needs of public employers to control their employees' work product, the Court rejected the notion that the First Amendment requires the "displacement of managerial discretion by judicial supervision." *Id.* at 422–23, 126 S.Ct. 1951.

Because Ceballos acknowledged that he had written the memo pursuant to his official duties, rather than as a citizen, the *Garcetti* Court did not set forth a test for determining when a public employee has spoken pursuant to his official duties. *Id.* The Court simply noted that "[t]he proper inquiry is a practical one" and that the employee's formal job description is not dispositive. *Id.* at 424, 126 S.Ct. 1951. ("[T]he listing of a given task in an employee's written job description is neither necessary nor sufficient to demonstrate that conducting the task is within the scope of the employee's professional duties for First Amendment purposes.") (*id.* at 425, 126 S.Ct. 1951); *see also Weisbarth v. Geauga Park Dist.*, 499 F.3d 538, 544 (6th Cir.2007) ("[A]d hoc or de facto duties can fall within the scope of an employee's official responsibilities despite not appearing in any written job description.").

■ No prescribed procedure or guiding principle for determining whether speech falls within an employee's official job duties has emerged from the .lower courts since *Garcetti*. Rather, courts make the determination on a case-by-case basis, looking at the totality of the circumstances. *See, e.g., Caruso v. Massapequa Union Free Sch. Dist.*, 478 F.Supp.2d 377, 382–83 (E.D.N.Y.2007) ("It is clear ... that application of *Garcetti* requires a fact-specific inquiry."). While the law in this area is still evolving, the facts of this case, in light of the law applied by other courts, strongly suggest that plaintiff spoke pursuant to his official duties when he made the radio transmissions on April 20, 2005.

The Seventh Circuit's decision in *Mills v. City of Evansville* is instructive. 452 F.3d 646 (7th Cir.2006). The plaintiff in *Mills* was a police sergeant whose responsibilities included supervising "crime prevention officers" ("CPOs"). *Id.* at 647. The police chief, who was plaintiffs superior, decided to reassign some CPOs, thereby reducing the number of CPOs under plaintiffs control. *Id.* Immediately after the meeting at which the police chief announced this decision, plaintiff told him and several of her other superiors "that the plan would not work, that community organizations would not let the change happen, and that sooner or later they would have to restore the old personnel assignment policies." *Id.* Plaintiff alleged that she subsequently suffered various adverse employment actions in retaliation for expressing her views, including reassignment and loss of supervisory responsibilities. *Id.* The Seventh Circuit affirmed the district court's grant of summary judgment against the plaintiff, because she "was on duty, in uniform, and engaged in discussion with her superiors, all of whom had just emerged from [the police chiefs] briefing. She spoke in her capacity as a public employee contributing to the formation and execution of official policy." *Id.* at 648.

In *Mulcahey v. Mulrenan*, the court granted summary judgment against a former captain of the New York City Fire Department ("FDNY"), who claimed to have suffered retaliation for engaging in First Amendment activity. 2008 WL 110949 (S.D.N.Y. Jan. 3, 2008). Specifically, the plaintiff requested, via memorandum, that his superiors exempt him from serving as an "Acting Battalion Chief" ("ABC") because he felt he had been asked to serve in that position "without training or experience required of the rank." *Id.* at *2 (internal quotation marks and citation omitted). Plaintiff felt that serving as an ABC without such training or experience endangered the public and placed other fire fighters at risk. *Id.*

The court, in holding that this speech was unprotected, considered that the plaintiff had acknowledged that his job duties included "protecting himself, his fellow firefighters, and members of the public from danger" and that the speech at issue involved plaintiffs belief that his work assignment "would have a negative impact on his unit and possibly on the public." *Id.* at *6–7. Plaintiffs speech was unprotected because it "dealt with his ability to perform his official duties." *Id.* The court found that "plaintiff spoke pursuant to official duties, through the FDNY chain of command—identifying a purported conflict in FDNY policy that affected his job responsibilities and reporting to his supervisors on matters affecting his unit's productivity, efficiency, and morale." *Id.* at *7.

Also instructive is the Fifth Circuit's analysis in *Williams v. Dallas Independent School District*, 480 F.3d 689 (5th Cir.2007). The plaintiff in *Williams* was a high school athletic director and football coach who disapproved of the manner in which his school handled athletic department funds. *Id.* at 690–91. The plaintiff

wrote a letter to the school's office manager, with a copy to the principal, complaining of the office manager's refusal to provide the plaintiff with information regarding the appropriation of certain funds and voicing suspicion about a negative balance in the athletic department's bank account. *Id.* at 690. About two months later, the plaintiff wrote a memorandum to the principal, expressing concern that gate receipts from athletic events were not distributed in accordance with "standard operating procedure." *Id.* at 690–91. Four days after receiving the memorandum, the principal removed the plaintiff as athletic director and the school district subsequently declined to renew his contract. *Id.* at 691.

The defendant school district conceded that writing memoranda was not a requirement of the plaintiff's job. *Id.* at 693. The court, therefore, framed the issue as "the extent to which, under *Garcetti,* a public employee is protected by the First Amendment if his speech is not necessarily required by his job duties but nevertheless is related to his job duties." *Id.* The court noted that Supreme Court precedent distinguishes speech or activities typically undertaken outside of work from speech or activities typically undertaken in the course of performing one's job. *Id.* "Activities undertaken in the course of performing one's job are activities pursuant to official duties." *Id.* Thus, whether the plaintiff's speech enjoyed First Amendment protection would depend on whether he wrote the memoranda at issue "in the course of performing his job as Athletic Director." *Id.* at 694.

The court held that the speech was unprotected. *Id.* Plaintiff's job required

him to buy sports equipment and arrange payment of tournament fees. *Id.* He, therefore, needed information about the availability of athletic department funds so that he could operate his department and he needed to consult with the office manager and the principal in order to carry out those tasks. *Id.* Moreover, in one of the memoranda, plaintiff accused the office manager of "hurt[ing] [his] ability to provide our student/athletes with critical items and/or materials necessary for competition." *Id.* at 690. In light of these facts, the court rejected the plaintiff's argument that he had spoken as a "taxpayer" and a "father" rather than an employee. *Id.* at 694. The court held that, because plaintiff wrote the memoranda in the course of performing his job as Athletic Director, the statements therein did not enjoy First Amendment protection. *Id.*

#### 2. *Application*

■■■ As described above, the question of whether a plaintiff spoke as a citizen or as a public employee is fact specific. A question of fact as to the scope of the plaintiff's duties can preclude summary judgment on the issue. *See, e.g., Paola v. Spada,* 498 F.Supp.2d 502, 509 (D.Conn. 2007). That being said, the facts set forth herein strongly suggest that *Garcetti* precludes any claim based on the April 20, 2005 radio transmissions. Plaintiff made the radio transmissions, and the statements contained therein, while on duty and in response to an order to have his unit, which was then at a training site, "go available." He spoke over the Fire Bureau's radio system. He spoke about the readiness of the firefighters under his command to respond to a live fire.[7] Sim-

---

7. Plaintiff, in his opposition papers, contends that "the transmission concerned all twelve men who were at [D]rill [S]chool that day," *some of whom* were not "supervise[d] in any way" by him. (Pl. Mem. Opp. Summ. J. at 4.) However, in the same paragraph, plaintiff states that, "when he made the radio transmission, the men [to whom] he was referring in that transmission had already left [D]rill [S]chool" and clearly were not under his supervision. (*Id.*) Plaintiff cannot raise an issue

ply, an ordinary citizen not employed by the Fire Bureau would not be in the position to form the opinion that plaintiff expressed or have the opportunity to convey it through the channels that he utilized. *See Garcetti,* 547 U.S. at 422, 126 S.Ct. 1951 ("Contrast, for example, the expressions made by the speaker in *Pickering,* whose letter to the newspaper had no official significance and bore similarities to letters submitted by numerous citizens every day."). An ordinary citizen could not have made this speech.

Moreover, plaintiff admits that, at the time he made the transmission, he was "concerned about the health and safety of the fire fighters who had been engaged in the live fire training and were physically exhausted," as well as "the safety of citizens whom these firefighters may be called upon to assist and/or rescue." (Am. Complt. ¶ 15.) Plaintiff felt that "command needed to be aware" that the firefighters at the drill site were " 'fatigued.' " (*Id.*) It seems incredible to suggest that plaintiff was not speaking as a fire lieutenant when he spoke about an issue of which he believed the department "needed to be aware" because the safety of other fire fighters and the general public was at risk. (*Id.*; *see also Mulcahey,* 2008 WL 110949, at *7.) This speech "owe[d] its existence to a public employee's professional responsibilities," *Garcetti,* 547 U.S. at 421, 126 S.Ct. 1951, and is, therefore, not protected by the First Amendment.

Plaintiff alleges that, while he was complying with the "go available" order, another fire fighter, Lieutenant Fiorisi, approached him specifically because of

"[p]laintiff's position as chair of health and safety [of the Union]" to discuss the crew's "exhaustion." (Pl. Mem. Opp. Summ. J. at 4–5.) Thus, plaintiff argues that he made the "fatigued" comment in his capacity as a representative of the Union and not as an employee of the Fire Bureau. (*Id.*) This argument is unpersuasive for several reasons. First, we note that plaintiffs assertion in the Amended Complaint and in his opposition to the instant motion for summary judgment that he spoke as a citizen and not as an employee is a legal conclusion that the Court is not bound to accept. *See, e.g., Tamayo v. Blagojevich,* 526 F.3d 1074, 1092 (7th Cir.2008) ("[Plaintiff] cannot escape the strictures of *Garcetti* by including in her complaint the conclusory legal statement that she testified 'as a citizen ... outside the duties of her employment.' ..."). And as plaintiff's brief and this Court's review of the case law reveals, it is a legal conclusion unsupported by legal authority. Still, to the extent that the speech of a third party, Lieutenant Fiorisi, has any bearing at all on *Garcetti's* "practical inquiry," this factor is easily outweighed by the others, detailed above, indicating that plaintiff spoke pursuant to his official duties.

One might interpret plaintiff's argument to mean that he was motivated by his duties to the Union and its members when he made the "fatigued" comment, rather than by any desire to carry out his responsibilities as a fire lieutenant. Nothing in *Garcetti* suggests that the speaker's subjective motivation should control the outcome, although it could, arguably, be a

---

of material fact by disputing his own statement. Based on a reading of the Amended Complaint (*see* Am. Complt. ¶¶ 13, 15) and plaintiff's representations in the instant motion papers, it appears undisputed that at least some of the firefighters to whom plaintiff referred in the transmission were under his supervision. Further, even assuming that

plaintiff told the dispatcher that only men from another unit, over which he had no supervisory authority, were fatigued, plaintiff directs the Court to no case law that finds this factor dispositive in an inquiry as to whether plaintiff was speaking as a fire lieutenant when he made such a remark.

part of a court's "practical inquiry." *See* 547 U.S. at 424, 126 S.Ct. 1951. However, plaintiff has not cited any case in which a court decided the *Garcetti* inquiry based on a plaintiff's conclusory legal statement that he had spoken as a citizen and, further, such a subjective representation seems unhelpful to a court's "practical inquiry." [8] As noted above, the *Williams* court rejected the plaintiff's claim that he had spoken as a "taxpayer" and a "father," rather than as an employee. *See* 480 F.3d at 694. And the *Tamayo* court noted that a plaintiff "cannot escape the strictures of *Garcetti* by including in her complaint the conclusory legal statement that she testified 'as a citizen.'" 526 F.3d at 1092. If a plaintiff's post-hoc statement of motivation were allowed to control, *Garcetti* would be eviscerated.

Plaintiff next argues that the "operat[ion] [of] a portable radio" was not added to the job description of a fire lieutenant until August 2007 and, therefore, whether the operation of the portable radio was within plaintiffs job description on April 20, 2005 is a question of fact. (Pl. Mem. Opp. Summ. J. at 4.) The *Garcetti* Court instructed that

> Formal job descriptions often bear little resemblance to the duties an employee actually is expected to perform, and the listing of a given task in an employee's written job description is neither necessary nor sufficient to demonstrate that conducting the task is within the scope of the employee's professional duties for First Amendment purposes.

547 U.S. at 424–25, 126 S.Ct. 1951. In light of this statement, it would clearly be a mistake to permit plaintiffs written job description to be the central focus of the

analysis. *See, e.g., Mulcahey*, 2008 WL 110949, at *6 ("[W]hile plaintiff[']s job description does not state that he should voice his discontent ... it is logical to conclude that verbalizing an inability to perform official duties is, itself, an official duty.") We, therefore, find that the lack of the specific words, "operate[ ] a portable radio" does not create a question of material fact. Rather, it is clear from the undisputed facts that, on April 20, 2005, plaintiff operated his department-issued handheld radio as part of his responsibilities as fire lieutenant.

Plaintiff's final argument regarding the radio transmissions is that "[p]laintiff's transmission about the physical condition of the men to advise command of their fatigue was, unlike his other transmissions, unsolicited." (Pl. Mem. Opp. Summ. J. at 4.) Plaintiff does not elaborate on how, from among ten radio transmissions made by plaintiff to the dispatcher within a narrow time frame on that day, the one radio transmission in which plaintiff spoke of the crew's physical condition was not "in response" to the dispatcher. While the relevance of plaintiff's argument regarding whether the "fatigued" comment was solicited is unclear, we note that the comment was, indisputably, made during a series of radio transmissions with the dispatcher and, ultimately, made as a result of the dispatcher's initial inquiries as to the crew's availability. To the extent plaintiff asks us to excise the "fatigued" comment from the rest of the transmissions for separate consideration, we decline to do so, as consideration of one statement, outside of the context in which it was made, would be untenable in light of *Garcetti*'s call for a "practical" inquiry.

---

8. Based on this reasoning, we also reject plaintiff's argument that, by referring to Houlihan as "Rich," instead of "Deputy Chief," plaintiff showed that "he was not expressing these concerns pursuant to any official duties as a lieutenant." (Pl. Mem. Opp. Summ. J. at 5.) Plaintiff has cited no case law indicating that a speaker's use of his supervisor's first name is relevant to the *Garcetti* inquiry.

For all these reasons, we find that, on April 20, 2005, plaintiff spoke in his capacity as a fire lieutenant and, therefore, his speech on that day was not constitutionally protected. Because his speech is not constitutionally protected, plaintiff fails to set out a *prima facie* case of First Amendment retaliation based on his April 20, 2005 radio transmissions.

### B. Constitutionally Protected Speech: Plaintiff's Union Activities

■ It is well-settled law that retaliation against a public employee solely for his union activities violates the First Amendment. *Clue v. Johnson*, 179 F.3d 57, 60 (2d Cir.1999). Therefore, plaintiff's association with and speech arising out of his position in the Union is constitutionally protected and defendants do not appear to argue otherwise. (*See generally* Defs. Mem. Supp. Summ. J.) Thus, the first requirement for a *prima facie* case of First Amendment retaliation is satisfied.

### C. Adverse Employment Action

■ It appears to be undisputed that the disciplinary charges preferred against plaintiff, and the thirty-day suspension in connection therewith, constituted an adverse employment action. (*See generally id.*) This satisfies the second requirement for a *prima facie* case of First Amendment retaliation based on plaintiff's Union activities.

### D. Causal Connection

■ We turn now to the third prong of a *prima facie* case of First Amendment retaliation, which is whether a causal connection exists between plaintiffs First Amendment activity and the adverse employment action. A causal connection exists where "it can be said that the speech was a motivating factor in the determination." *Washington*, 373 F.3d at 320. A plaintiff may establish causation directly, by evidence of retaliatory animus against plaintiff, or "indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct." *Woods v. Enlarged City Sch. Dist. of Newburgh*, 473 F.Supp.2d 498, 528 (S.D.N.Y.2007) (Conner, J.) (internal quotation marks and citation omitted); *see also Morris v. Lindau*, 196 F.3d 102, 110 (2d Cir.1999).

■ Plaintiff first argues that direct evidence of a causal connection exists, based on defendants' retaliatory animus towards plaintiff while plaintiff was acting in his capacity as a member of the Union. This animus, alleges plaintiff, consisted of "condescending responses, negative comments, and uncomfortable looks at [p]laintiff" by Straub, Jennings and Lyman during meetings that took place between 2002 and 2005, during which defendants and plaintiff disagreed about the management of the Fire Bureau. (Pl. Mem. Opp. Summ. J. at 6.) Plaintiff does not cite any case that supports his argument that "hostile looks, condescending and almost bitter responses," alone "sufficiently demonstrate[ ] the requisite proof of [d]efendants' unlawful motives and intent." (*Id.* at 6–11.) In fact, we have found no case that supports such a finding and we decline to hold that disagreement, hostility or negative facial expressions or gestures, alone, are sufficient to support an inference of retaliatory animus.

■ In the absence of direct evidence of a causal relationship, a plaintiff may "rely on the temporal proximity of the protected action and the adverse employment action." *Woods*, 473 F.Supp.2d at 528. The Second Circuit has "not drawn a bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relation-

ship," *Gorman–Bakos v. Cornell Coop. Extension of Schenectady County,* 252 F.3d 545, 554 (2d Cir.2001), however, one district court noted that "[t]hree months is on the outer edge" of the limit. *Yarde v. Good Samaritan Hosp.,* 360 F.Supp.2d 552, 562 (S.D.N.Y.2005). In the instant case, viewing the record in the light most favorable to the plaintiff, plaintiffs last constitutionally-protected speech occurred during a "City budget meeting" in May 2005, where he was "outspoken to councilmen and Straub." (Pl. Mem. Opp. Summ. J. at 12.) While the details of the May 2005 meeting are undeveloped, to the extent that it did take place, and to the extent that plaintiff did engage in First Amendment activity during that meeting, both of which we accept as true for the purposes of this motion, the May 2005 meeting occurred less than three months prior to the preferring of disciplinary charges against plaintiff in July 2005. Therefore, while plaintiff has set forth no direct evidence of retaliatory animus, we find that there is sufficient temporal proximity between the First Amendment activity and the adverse employment action to support the requisite causation prong of plaintiff's *prima facie* case. Thus, plaintiff has set forth a *prima facie* case of First Amendment retaliation based on speech arising out of his Union membership.

### E. *Rebuttal of the Prima Facie Case*

■ The Court, having found that plaintiff has established a *prima facie* case of first Amendment retaliation, turns now to the question of whether defendants may avoid liability by demonstrating that they would have taken the same action in the absence of plaintiff's protected speech. *Heil,* 147 F.3d at 110. The Second Circuit has held that "[c]onduct that is properly

initiated, reasonably executed, independently justified and equally administered-regardless of any animosity towards the plaintiff-does not give rise to a constitutional claim for retaliatory harassment." *Diesel v. Town of Lewisboro,* 232 F.3d 92, 109 (2d Cir.2000).

■ Defendants contend that they administered discipline against both plaintiff and Toglia for "failure to prepare [ ] engine compan[ies] to respond timely to Roberto's go available directive" and that defendants would have administered the same charges "regardless of plaintiffs speech." (Defs. Mem. Supp. Summ. J. at 18.) However, the charges preferred against plaintiff did not arise exclusively out of an alleged failure to respond in a timely way to an order and the charges were not the same as those brought against Toglia. Rather, the charges preferred against plaintiff also included a charge of an inappropriate radio transmission arising out of his comment regarding the fatigued status of the crew.[9] Toglia was not charged with an inappropriate radio transmission. We, therefore, cannot hold, based solely upon a review of the charges preferred against Toglia and plaintiff, as a matter of law, that defendants would have taken the same action if plaintiff had not engaged in First Amendment-protected Union speech. Further, while defendants set forth several arguments as to the validity of the charges arising out of plaintiffs alleged delayed response to Roberto's "go available" directive, they set forth no arguments as to the legitimacy of the initially preferred charge of an inappropriate radio transmission. (*Id.* at 18–19.)

We do not hold that, but for plaintiff's Union activity, defendants would not have

---

9. The inappropriate radio transmission charge was subsequently dropped during plaintiff's disciplinary hearing.

preferred disciplinary charges against him; indeed they may well have. Rather, we hold that defendants have not met their burden for a grant of summary judgment on that basis.

### III. Qualified Immunity

The doctrine of qualified immunity shields government agents from liability for their official actions, unless their conduct violates clearly established constitutional rights of which an objectively reasonable official would have known. *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982); *Almonte v. City of Long Beach*, 478 F.3d 100, 110 (2d Cir.2007). Defendants' arguments in favor of a grant of qualified immunity center exclusively around the issue of whether plaintiffs speech on April 20, 2005 was clearly established First Amendment speech. We have already found, as discussed above, that plaintiff's speech on that day was not constitutionally protected. Therefore, we need not address defendants' arguments regarding qualified immunity on this issue. Defendants make no argument regarding whether qualified immunity is appropriate on plaintiff's claim that defendants retaliated against him for his Union-related First Amendment activities. (*See* Defs. Mem. Supp. Summ. J. at 20–21.) Therefore, we decline to grant qualified immunity, as defendants appear to seek such immunity based only on alleged retaliation against speech that we have already found to be unprotected.

### CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment (Doc. # 32) is granted insofar as the First Amendment claim is based on adverse action in response to radio transmissions on April 20, 2005 and denied in all other respects.

SO ORDERED.