IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

March 26, 2008

Charles R. Fulbruge III
Clerk

No. 07-50537
Summary Calendar

SHELTON CHARLES

Plaintiff-Appellee

V.

GARY GRIEF, in his individual and official capacity

Defendant-Appellant

Appeal from the United States District Court
for the Western District of Texas
USDC No. 1:06-CV-158

Before WIENER, BENAVIDES, and PRADO, Circuit Judges.

WIENER, Circuit Judge:[*]

Defendant-Appellant Gary Grief, an upper-level official of the Texas Lottery Commission (the "Commission"), appeals the district court's denial of his summary judgment motion to dismiss him, on grounds of qualified immunity, as a defendant in the 42 U.S.C. § 1983 employment retaliation suit filed by Plaintiff-Appellee Shelton Charles,[1] whom Grief fired from his job as a systems

---

[*] This panel granted rehearing and withdrew the opinion filed November 6, 2007, for which this opinion is now substituted. *Charles v. Grief*, 512 F.3d 753 (5th Cir. 2008).

[1] Charles's first amended complaint also includes allegations of racial discrimination and retaliation in violation of the Texas Commission on Human Rights Act and Title VII of the

analyst with the Commission. Concluding that the district court correctly determined that, if Charles could prove that Grief fired him for his "speech," Charles has alleged an objectively unreasonable violation of his First Amendment rights because the speech for which he was putatively fired was entitled to constitutional protection, we affirm in part. But further concluding that we lack jurisdiction to assess whether Grief's actions were "objectively reasonable" because the district court determined that there is a genuine fact question as to the real reason for Charles's termination, i.e., his speech or his insubordination, we dismiss in part Grief's interlocutory appeal of the denial of qualified immunity.

## I. FACTS & PROCEEDINGS

Charles is an African-American who, in October 2005, sent an e-mail to high-ranking Commission officials, including Grief, raising concerns about racial discrimination and retaliation against him and other minority employees of the Commission. In November 2005, after failing to receive a response, Charles re-sent that e-mail, this time directing it to members of the Texas Legislature with oversight authority over the Commission. Additionally, Charles sent a new e-mail to these same members of the legislature alleging, inter alia, violations of the Texas Open Records Act, misuse of state funds, and other misconduct by Commission management. Two days later, Grief directed Charles to meet with his immediate supervisor and a human resources manager to answer questions regarding the e-mails. When those two began to question Charles about the e-mails, he requested that the Commission's questions be put in writing so that he could respond in writing. According to allegations by Charles, one of the representatives of the Commission agreed to do so; but later that same day,

Civil Rights Act. His amended complaint, though, was filed after the district court denied Grief's motion for summary judgment seeking dismissal of Charles's 42 U.S.C. § 1983 employment retaliation suit; therefore, this appeal is necessarily limited to Charles's First Amendment retaliation claim.

Grief appeared unannounced in Charles's office and fired him on the spot. Grief handed Charles a written statement to the effect that he was being fired for insubordination, specifically for his "refusal to respond to the direct requests from [his] immediate supervisor."

After Charles sued Grief and the Commission for employment retaliation in violation of Charles's constitutional right of free speech, Grief sought dismissal as a defendant on grounds of qualified immunity, which the district court denied, largely on the basis of a magistrate judge's report and recommendation. Like the magistrate judge, the district court concluded that Charles had introduced summary judgment evidence that, when viewed in the light most favorable to him as the nonmovant, was sufficient to establish that (1) Charles's acts were protected by clearly established First Amendment law,[2] and (2) Grief's acts were objectively unreasonable.

Grief timely filed a notice of appeal, challenging the district court's order that denied him qualified immunity, specifically the court's conclusion that Charles had alleged a violation of a constitutional right. In his appeal from the denial of qualified immunity, Grief insists that his firing of Charles was "objectively reasonable" because he was responding to reports of Charles's insubordination, not to his speech. Alternatively, Grief advances that Charles's speech is not protected because (1) his e-mails are too "vague, conclusory, and non-factual" to involve matters of public concern, and (2) his speech was made

---

[2] The district court concluded that Charles presented evidence sufficient to establish all elements of a First Amendment retaliation claim, viz., that: (1) he suffered an adverse employment action; (2) his speech involved a matter of public concern; (3) his interest in speaking outweighs the employer's interest in promoting efficiency in the workplace; and (4) his speech motivated the employer's adverse employment action. Modica v. Taylor, 465 F.3d 174, 179-80 (5th Cir. 2006); Kinney v. Weaver, 367 F.3d 337, 356 (5th Cir. 2004) (en banc).

in the context of his employment as a Commission employee, and therefore, pursuant to Garcetti v. Ceballos, is not protected.[3]

## II. DISCUSSION

### 1.   Appellate Jurisdiction

"Although a denial of a defendant's motion for summary judgment is ordinarily not immediately appealable, the Supreme Court has held that the denial of a motion for summary judgment based upon qualified immunity is a collateral order capable of immediate review.  Our jurisdiction is significantly limited, however, for it extends to such appeals only to the extent that [the denial of summary judgment] turns on an issue of law."[4]

"[O]fficials enjoy qualified immunity to the extent that their conduct is objectively reasonable in light of clearly established law.  Whenever the district court denies an official's motion for summary judgment predicated upon qualified immunity, the district court can be thought of as making two distinct determinations, even if only implicitly.  First, the district court decides that a certain course of conduct would, as a matter of law, be objectively unreasonable in light of clearly established law.  Second, the court decides that a genuine issue of fact exists regarding whether the defendant(s) did, in fact, engage in such conduct.  According to the Supreme Court, as well as our own precedents, we lack jurisdiction to review conclusions of the second type on interlocutory appeal. Stated differently, in an interlocutory appeal we cannot challenge the district court's assessments regarding the sufficiency of the evidence—that is, the question whether there is enough evidence in the record for a jury to conclude that certain facts are true.  We do, however, have jurisdiction to review the first

---

[3] 126 S. Ct. 1951 (2006).

[4] Kinney, 367 F.3d at 346 (internal citation and quotations omitted).

type of determination, the purely legal question whether a given course of conduct would be objectively unreasonable in light of clearly established law."[5]

## 2. Qualified Immunity

"To determine whether an official is entitled to qualified immunity, the court asks (1) whether the plaintiff has alleged a violation of a constitutional right, and (2) whether the defendant's conduct was objectively reasonable in light of the clearly established law at the time of the incident."[6]

Terminating an employee for engaging in protected speech, of which Charles accuses Grief, is an objectively unreasonable violation of such an employee's First Amendment rights. Grief, though, insists that (1) Charles did not engage in protected speech, but (2) even if he did, Grief's actions were "objectively reasonable" because he fired Charles, not for his speech, but for his "insubordination" when he refused to respond to the Commission's questions unless they were put in writing.

Whether Charles engaged in protected speech is a purely legal question over which we have appellate jurisdiction.[7] We do not, however, have jurisdiction to review Grief's contention that his actions in firing Charles were "objectively reasonable."[8] Whether Grief's actions were reasonable depends on his real reason for firing Charles; and the district court determined that Charles had introduced sufficient evidence to establish a genuine issue of material fact as to causation, viz., whether he was fired for (1) being insubordinate (as Grief

---

[5] Id. at 346-47 (emphasis in original) (internal citations omitted).

[6] Connelly v. Tex. Dep't of Criminal Justice, 484 F.3d 343, 346 (5th Cir. 2007).

[7] See, e.g., Connick v. Myers, 461 U.S. 138, 148 n.7 (1983); Williams v. Dallas Indep. Sch. Dist., 480 F.3d 689, 692-94 (5th Cir. 2007).

[8] See, e.g., Connelly, 484 F.3d at 346-47 (rejecting same argument urged by Grief).

maintains), or (2) his speech (as Charles insists).[9]  "To the extent that [Grief] attacks the district court's determination of the genuineness, rather than the materiality, of any dispute concerning [Charles's] factual assertions, the [appellate] court may not consider his argument at this juncture."[10]

3.    Protected Speech

"Public employees do not surrender all their free speech rights by reason of their employment.  Rather, the First Amendment protects a public employee's right, in certain circumstances, to speak as a citizen on matters of public concern."[11]  "A public employee's speech is protected by the First Amendment when the interests of the worker 'as a citizen commenting upon matters of public concern' outweigh the interests of the state 'as an employer, in promoting the efficiency of the services it performs through its employees.'"[12]

a.    Garcetti v. Ceballos

Before proceeding to examine the substance of Charles's speech, we must first focus on his role when he uttered it.  "Emphasizing the distinction between a speaker acting in her role as 'citizen' and her role as 'employee,' Garcetti held that the First Amendment does not protect 'expressions made pursuant to [the employee's] official duties.'  Even if the speech is of great social importance, it is not protected by the First Amendment so long as it was made pursuant to the

---

[9] We note, though, that "[s]ince we lack jurisdiction to review a denial of summary judgment based on the district court's conclusion that fact questions exist regarding whether the defendants engaged in conduct that would violate clearly established law, officials may sometimes be required to proceed to trial even though the ultimate resolution of those factual disputes may show that they are entitled to qualified immunity from liability."  Kinney, 367 F.3d at 346 n.8.

[10] Connelly, 484 F.3d at 346-47.

[11] Williams, 480 F.3d at 691.

[12] Id. at 692 (citing Pickering v. Bd. of Educ., 391 U.S. 563, 568 (1968)).

worker's official duties."[13]   Stated differently, "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline."[14]

Albeit in the alternative to his primary proffered reason for firing Charles (insubordination), Grief insists that Charles's First Amendment claims are foreclosed by Garcetti v. Ceballos[15] and Williams v. Dallas Independent School District[16] because his speech was made in the context of his employment as a systems analyst for the Commission.  Grief substantially overstates the reach of Garcetti and Williams in his briefs: Charles's speech does not come within their ambits.[17]

In Garcetti, a deputy district attorney reported to his supervisor that there were inaccuracies in an affidavit supporting a search warrant and recommended that the office refrain from prosecuting the case.  The deputy alleged that he was subjected to a series of retaliatory actions in response to this intra-office speech.  The Supreme Court concluded that the deputy's speech was not entitled to First Amendment protection because it was made pursuant to his official duties,

---

[13] Id. (citing Garcetti v. Ceballos, 126 S. Ct. 1951, 1960 (2006)).

[14] Garcetti, 126 S. Ct. at 1960.

[15] 126 S. Ct. 1951.

[16] 480 F.3d 689.

[17] The magistrate judge commented in his report and recommendation that the question whether Charles's statements were made in his capacity as a concerned citizen or as a Commission employee is "a material issue of genuine fact properly resolved at trial."  On further reflection, we acknowledge that, even though analyzing whether Garcetti applies involves the consideration of factual circumstances surrounding the speech at issue, the question whether Charles's speech is entitled to protection is a legal conclusion properly decided at summary judgment.  See id. at 691-94.

specifically in fulfillment of his responsibility to advise his supervisor about how best to proceed with a pending case.[18]

Williams requires us to determine the extent to which a public employee's speech was protected if his speech was not necessarily required by his job duties but was nevertheless related to them.[19] In that case, an athletic director was removed from his position after he wrote memoranda to high-ranking school officials, including the principal, calling into question the school's handling of its athletic fund. We concluded that the athletic director's speech concerned the fulfillment of his daily operations, namely budgeting for various athletic department expenses.[20] Accordingly, we held that, under Garcetti, his speech was not entitled to First Amendment protection because it was made in the course of performing his employment responsibilities.

Grief insists that Garcetti and its progeny control, emphasizing that (1) Charles's speech concerned "special knowledge" that he had obtained through his employment at the Commission, and (2) Charles identified himself in his e-mails as a Commission employee. Even when accepted as true, neither of these assertions is dispositive. To hold that any employee's speech is not protected merely because it concerns facts that he happened to learn while at work would severely undercut First Amendment rights. Also, it is apparent that Charles identified himself as a Commission employee solely to demonstrate the veracity of the factual allegations he was making in his e-mails to the legislators. After introducing himself as a Commission employee, Charles further emphasized the foundation for his allegations by stating that he was available to speak to the

---

[18] Garcetti, 126 S. Ct. at 1959-60.

[19] Williams, 480 F.3d at 693.

[20] Id. at 693-94. See id. at 694 ("He needed account information so that he could properly execute his duties as Athletic Director, namely, taking the students to tournaments and paying their entry fees.").

legislative officials about activities that he had "witnessed" while employed. Moreover, Charles submitted the e-mails from his private e-mail address and listed his home address and phone number for his contact information, all of which further undermines the emphasis Grief tries to place on Charles's identification of himself as a Commission employee.

Most significantly, though, Charles's speech—unlike that of the plaintiffs in Garcetti and Williams—was not made in the course of performing or fulfilling his job responsibilities, was not even indirectly related to his job, and was not made to higher-ups in his organization (as were Ceballos's and Williams's) but was communicated directly to elected representatives of the people. As a systems analyst, Charles worked in the area of Information Resources as a senior technical lead coordinating and supporting the Commission's computer network operations. He was not in a professional position of trust and confidence like those of an assistant district attorney or a sheriff's deputy. Even though his job description is not contained in the record on appeal[21] and is therefore unavailable to us, we are convinced that his e-mails concerned topics far removed from the realm of—and unrelated to—any conceivable job duties. As the district court indicated, there can be no Garcetti-like nexus between Charles's systems analyst's work and the malfeasance that he sought to expose to the cognizant public authorities.

Moreover, the persons to whom Charles directed his e-mails further distinguishes his speech from that of the plaintiffs in Garcetti and Williams: Charles voiced his complaints externally, to Texas legislators who had oversight authority over the Commission, not internally, to supervisors. His decision to

---

[21] Grief failed to introduce Charles's official job description in his motion for summary judgment even though he insists that Charles's speech was "work-related." Regardless, both the Supreme Court and this circuit have recognized that a formal job description is not dispositive. Garcetti, 126 S. Ct. at 1961-62; Williams, 480 F.3d at 692.

ignore the normal chain of command in identifying problems with Commission operations is a significant distinction. We conclude that Charles's speech is not left unprotected by Garcetti's genre of "non-protected" speech and turn next to examine whether his speech involved matters of public concern.

b.  Public Concern

"Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement."[22] It is well-established, though, that speech relating to official misconduct or racial discrimination almost always involves matters of public concern.[23] Here, Charles's e-mails plainly and clearly addressed these issues of public importance. We reject Grief's contention that Charles's post-hoc refusal to answer the Commission questions orally somehow rendered his allegations "too vague" to involve matters of public concern. That is simply a non-sequitur under these facts.

Charles's first e-mail advanced allegations of racial discrimination. Specifically, Charles alleged that he was individually being "treated in a discriminatory manner both in salary and working environment"; and, on a broader scale affecting all employees, that "salary, treatment, and advancement [at the Commission] are based on racial bias." His second e-mail—the only one

---

[22] Connick v. Myers, 461 U.S. 138, 147-48 (1983).

[23] See, e.g., Modica v. Taylor, 465 F.3d 174, 180-81 (5th Cir. 2006) (misuse of public funds and official malfeasance held to be matters of public concern); Wallace v. County of Comal, 400 F.3d 284, 289-91 (5th Cir. 2005) ("[T]here is perhaps no subset of matters of public concern more important than bringing official misconduct to light."); Kinney v. Weaver, 367 F.3d 337, 369 (5th Cir. 2004) ("[I]t is well-established in the jurisprudence of both the Supreme Court and this court that official misconduct is of great First Amendment significance."); Branton v. City of Dallas, 272 F.3d 730, 745 (5th Cir. 2001) ("We have held that public employees' speech reporting official misconduct, wrongdoing, or malfeasance on the part of public employees involves matters of public concern."); Victor v. McElveen, 150 F.3d 451, 456 (5th Cir. 1998) (plaintiff's speech "was inherently of public concern because it was a protest against racial discrimination").

at issue in this interlocutory appeal—focused on misconduct by Commission officials. In it, he alleged that (1) Commission management had violated the Texas Open Records Act by inflating the cost to obtain information; (2) Commission meetings were held in which the main topic of discussion concerned how to block public access to Commission information; (3) the Commission had misused state funds allocated to the Lottery Disaster Recovery site, the agency's computer records recovery system which remained non-operational; and (4) the Commission had taken steps to conceal this misuse of public funds. Moreover, Charles directed his speech to legislative officials with oversight authority over the Commission, i.e., elected officials external to the Commission who were in a position of authority to address the concerns raised.[24] Accordingly, we reject Grief's contention that Charles's speech fails to meet the second requirement of a First Amendment retaliation claim: His speech obviously involved matters of public concern and did so with an abundance of specificity.

c.    Pickering Balancing

Grief, by his express declaration, limits his challenge for purposes of this qualified immunity appeal to the second prong of Charles's First Amendment retaliation claim, insisting only that Charles's speech was of a private quality, rather than of a public one. Therefore, to the extent that he might have analyzed the Pickering v. Board of Education balancing test[25] and urged that the Commission's interest in promoting efficiency in the workplace outweighs

---

[24] Modica, 465 F.3d at 181 (noting fact that plaintiff chose to voice her concerns to someone other than her employer "supports her contention that the speech is public").

[25] The Pickering balance concerns the "balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." 391 U.S. 563, 568 (1968).

Charles's interest in commenting on matters of public concern, this argument is waived and foreclosed on appeal.[26]

## III. AD HOMINEM

Although we agree on rehearing that we are not without jurisdiction over all aspects of Grief's appeal, we note that the key issue before us—the one emphasized by both the district court in its denial of qualified immunity and by Grief on appeal—is causation, i.e., Grief's true reason for firing Charles. Grief insists that his actions were objectively reasonable because he fired Charles, not for his speech, but for his insubordination. The district court, however, clearly ruled that Charles produced sufficient evidence to show that there existed a genuine issue of material fact on the issue of causation, noting, inter alia, the close proximity of time between Charles's protected speech and his termination. Our precedent is clear that we lack jurisdiction over such appeals of fact-based denials of qualified immunity,[27] and we trust that counsel will in future interlocutory appeals make sure to challenge only those rulings involving questions of law and not waste valuable resources appealing those determinations over which we clearly lack jurisdiction.

---

[26] We note, though, that Grief's abandonment of this argument does not work to his disadvantage, as the Pickering prong of Charles's First Amendment retaliation claim is one on which Charles surely would prevail. Charles presents a substantial First Amendment interest, as his speech was indisputably made in an effort to prompt an investigation into important matters of public concern: namely, misuse of public funds, official misconduct, racial discrimination, and breach of the public trust. Furthermore, we are hard-pressed to imagine how concern over the efficient operation of the Commission might override such a weighty interest. Charles's speech concerned matters wholly unrelated to his responsibilities as a systems analyst, and was directed externally to legislative officials instead of to other Commission employees or supervisors. There is no evidence in the record, nor even any suggestion, that his speech negatively affected his or others' working relationships or otherwise disrupted the workplace. See, e.g., Wallace v. County of Comal, 400 F.3d 284, 290 (5th Cir. 2005) ("Under the Supreme Court's Pickering test, the court is required to look at whether the speech (1) was likely to generate controversy and disruption, (2) impeded the department's general performance and operation, and (3) affected working relationships necessary to the department's proper functioning.") (internal quotations omitted).

[27] See, e.g., Connelly v. Tex. Dep't of Criminal Justice, 484 F.3d 343 (5th Cir. 2007).

## IV. CONCLUSION

With respect to Grief's contention that his actions in terminating Charles were objectively reasonable, we dismiss for lack of jurisdiction: Whether Grief's actions were reasonable turns on causation, i.e., the real reason why Charles was fired—blowing the whistle or insubordination—about which the district court concluded that there was a genuine issue of material fact. With respect to the district court's holding that Charles did allege an objectively unreasonable violation of his constitutional rights by Grief, we affirm. Because (1) Garcetti does not apply, (2) Charles's speech involved matters of public concern, and (3) on appeal Grief has waived or abandoned the issue of the Pickering balancing test, Charles's speech is entitled to First Amendment protection if on remand Grief is found to have fired Charles for that speech, in whole or in part.

In conclusion, we reiterate that we are without jurisdiction to review causation. On remand, though, because we have concluded that Charles's speech was protected, the trier of fact's determination whether his firing was motivated by his e-mails or by his insubordination will dictate whether he is entitled to recover on his First Amendment retaliation claim.[28]

AFFIRMED in part; DISMISSED in part for lack of appellate jurisdiction; REMANDED for further proceedings consistent with this opinion.

---

[28] In assessing causation on remand, the district court should remain mindful that this court has made clear that "First Amendment retaliation claims are governed by the Mt. Healthy 'mixed-motives' framework, not by the McDonnell Douglas pretext analysis." Gonzales v. Dallas County, 249 F.3d 406, 412 n.6 (5th Cir. 2001). In Mt. Healthy City School District Board of Education v. Doyle, 429 U.S. 274, 287 (1977), the Supreme Court held that, once an employee has met his burden of showing that his protected conduct was a "substantial factor" or "motivating factor" in the employer's adverse employment action, the district court should "determine whether [the employer] ha[s] shown by a preponderance of the evidence that it would have [taken the same adverse employment action] even in the absence of the protected conduct." If the employer is able to make such a showing, then the protected conduct in question does not amount to a constitutional violation justifying remedial action.

We observe, though, that Grief makes no mention of the applicability of the Mt. Healthy defense, either in his appellate briefs or in his pleadings filed in the district court. Accordingly, we do not address this potential defense at this time. See Connelly, 484 F.3d at 346 n.1.