# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 13-40685

United States Court of Appeals
Fifth Circuit

**FILED**

September 15, 2014

Lyle W. Cayce
Clerk

CHRISTIAN CUTLER,

Plaintiff–Appellee

v.

STEPHEN F. AUSTIN STATE UNIVERSITY; BAKER PATTILLO, President
of Stephen F. Austin University; RICHARD BERRY, Vice President of
Stephen F. Austin; A. C. HIMES, Dean of Fine Arts at Stephen F. Austin
University; SCOTT ROBINSON,

Defendants–Appellants

Appeal from the United States District Court
for the Eastern District of Texas

Before DENNIS and PRADO, Circuit Judges, and BROWN, District Judge. *

EDWARD C. PRADO, Circuit Judge:

Plaintiff–Appellee Christian Cutler ("Cutler") sued Defendants–Appellants ("Defendants"), university officials at Stephen F. Austin State University (the "University"), under 42 U.S.C. § 1983 alleging he was fired in retaliation for the exercise of protected speech in violation of the First Amendment. Specifically, Cutler alleges he was fired from his position as Director of the University's art galleries after he told a member of U.S. Representative Louie Gohmert's staff that he believed Rep. Gohmert was a

---

* District Judge of the Eastern District of Louisiana, sitting by designation.

No. 13-40685

"fear monger." The central dispute in the case is whether Cutler was speaking as a citizen on a matter of public concern within the protection of the First Amendment or pursuant to official duties. Defendants appeal the district court's denial of summary judgment on qualified immunity grounds. We affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

In 2007, Christian Cutler became Director of Art Galleries at Stephen F. Austin State University, a public university located in Nacogdoches, Texas. *See* Tex. Educ. Code § 101.01(a). The job required Cutler to "oversee[] the planning and execution of exhibition and other programs that support the mission of the School of Art, the University, and the larger East Texas arts community." The job's particular responsibilities included "maintain[ing] good public relations, including working with community support groups, as well as coordinating special events with other arts and cultural groups in the area"; "[s]erv[ing] as liaison between the University and the larger arts community"; and "[p]lan[ning] and mak[ing] arrangements for [the] annual calendar of exhibitions."

According to Cutler, sometime in 2010, a member of Representative Louie Gohmert's staff called Cutler to invite him to "jury"—that is, curate and judge—a high school art exhibition and contest in Tyler, Texas, hosted by the representative. Cutler recalls the conversation being "very vague" and recalls asking the staff member to send him more information, which the staff member agreed to do. When Cutler did not hear from Rep. Gohmert's office, he researched Rep. Gohmert on the Internet to learn more about him. Cutler formed a negative impression of Rep. Gohmert after reading his widely

2

## No. 13-40685

publicized statements[1] and concluded that he would decline Rep. Gohmert's offer when he next spoke to the staff member. According to Cutler, in early September 2010, following an exchange of phone messages with members of Rep. Gohmert's staff, Cutler again spoke with Rep. Gohmert's staff to say he was no longer interested in jurying Rep. Gohmert's art show. In the course of explaining his rejection, Cutler explained his impression that Rep. Gohmert was a fear monger with whom Cutler did not want to be associated.

Citing deposition testimony from Cutler and Rep. Gohmert's staff member, the Defendants maintain that the staff member called Cutler to express Rep. Gohmert's interest in hosting the contest at the University. The Defendants further contend that Cutler was made aware of this invitation to *host* a competition, not to *jury* one, in his second conversation with Rep. Gohmert's staff member.

On September 20, 2010, Cutler received a letter from Rep. Gohmert in response to the rejection, copying University President Dr. Baker Pattillo ("Pattillo"). In the letter, Rep. Gohmert expressed disappointment that Cutler would "not host the Congressional High School Art Competition this fall because you did not 'want to be involved in any way' with me," and informed Cutler that "[w]e will not bother you in the future" with an invitation to host the event.

The same day Pattillo received the letter, he instructed University Provost Dr. Richard Berry ("Berry") to look into the matter. Berry in turn told

---

[1] These included Rep. Gohmert's statement on the floor of the House of Representatives about "terror babies," in which Rep. Gohmert claimed that a retired FBI agent had told him the FBI was investigating overseas terrorism cells planning to place pregnant women in the United States. According to Gohmert, the women were to have a baby or babies and return back overseas to raise the children, now U.S. citizens, to become future terrorists, so the children could someday return to "destroy our way of life." 156 Cong. Rec. H4867 (daily ed. June 24, 2010) (statement of Rep. Gohmert).

No. 13-40685

University Dean of Fine Arts Dr. Addison C. Himes ("Himes") to get Cutler's story. Himes delegated the task to Dr. Scott Robinson ("Robinson"), the Director of the School of Art Galleries and Cutler's direct supervisor. That evening, just hours after Cutler and Pattillo had received Rep. Gohmert's letter, Cutler received a call from Robinson, who wanted to discuss the incident. Robinson took down notes from the call.

The following morning, on September 21, Berry, Himes, and Robinson met to discuss the call. Robinson recounted his conversation with Cutler and shared his notes. Berry also reviewed prior reports of Cutler's conduct. On September 22, Cutler sent an unsolicited email to Pattillo, Himes, and Robinson explaining the incident. On September 23, Cutler met with Himes and then with Berry. Berry then recommended that Pattillo fire Cutler. Pattillo accepted Berry's recommendation. On September 27, Himes gave Cutler a letter of termination from Berry. Cutler was offered the opportunity to resign and resigned immediately.

On October 14, 2011, Cutler sued Pattillo, Berry, Himes, and Robinson in federal court under 42 U.S.C. § 1983 alleging retaliation for the exercise of protected speech in violation of the First Amendment. Following full discovery, Defendants filed a motion for summary judgment on the merits of Cutler's claim and asserting qualified immunity. The district court denied the motion on both grounds. The district court found that there was a genuine issue of material fact as to whether Himes and Robinson exerted influence over the ultimate decision. In response to Defendants' arguments that an employer's decisionmaking should be given some deference following a reasonable investigation, the district court found a "genuine fact issue as to whether Defendants conducted a reasonable investigation and, as a consequence, whether they reasonably found that Cutler was responding" in an official

4

capacity.   The court further found that Cutler had presented sufficient evidence to create a genuine fact issue as to whether "Cutler or Defendants reasonably believed that Cutler was responding to a request to jury an art contest as a private citizen or to host the contest at SFA in his official capacity." Finally, the court found that the Defendants were not entitled to summary judgment on qualified immunity grounds.

The Defendants filed a timely notice of appeal, and the district court granted the Defendants' motion to stay trial pending this interlocutory appeal.

## II.  JURISDICTION

Defendants raise two issues on appeal: whether the district court erred in denying summary judgment on qualified immunity grounds; and whether the district court erred in denying summary judgment for Robinson and Himes on the grounds that those two university officials were not final decisionmakers whose conduct is covered by § 1983.  The parties first contest whether our court has jurisdiction to hear these claims.

### A.     Legal Questions on Qualified Immunity Appealable

Although a denial of summary judgment is typically unappealable, defendants have a *limited* ability to appeal a denial of qualified immunity under the collateral order doctrine.  We have jurisdiction over denials of qualified immunity only "to the extent that the district court's order turns on an issue of law." *Kovacic v. Villarreal*, 628 F.3d 209, 211 (5th Cir. 2010).

This court does "not have jurisdiction to review the genuineness of any factual disputes but can decide whether the factual disputes are material." *Id.* at 211 n.1.  We have "jurisdiction to review the materiality of disputed facts as well as the district court's legal analysis as it pertains to qualified immunity." *Wyatt v. Fletcher*, 718 F.3d 496, 502 (5th Cir. 2013).   That is, we have "jurisdiction only to decide whether the district court erred in concluding as a

matter of law that officials are not entitled to qualified immunity on a given set of facts." *Kinney v. Weaver*, 367 F.3d 337, 347 (5th Cir. 2004) (en banc). Consequently, in the course of our analysis, we must disentangle those arguments that raise mere factual disagreements, over which we lack jurisdiction, from those that raise purely legal questions.

## B.    Final-Decisionmaker Merits Issue Unappealable

Cutler contends that the Defendants cannot raise their final-decisionmaker issue as a part of the qualified-immunity appeal because the Defendants never raised these arguments below. We find it doubtful that the Defendants waived this argument. But Cutler is nevertheless correct that we cannot hear Defendants' fact-dependent final-decisionmaker claim.

The Supreme Court has concluded that the final-decisionmaker question is a mere defense from liability, not an immunity from suit. *See Swint v. Chambers Cnty. Comm'n*, 514 U.S. 35, 43 (1995) ("The commission's assertion that Sheriff Morgan is not its policymaker does not rank, under our decisions, as an immunity from suit. Instead, the plea ranks as a 'mere defense to liability.'" (citation omitted)). As a mere defense from liability, the issue cannot satisfy the collateral order doctrine test. Far from being a separate, unreviewable, and conclusive order, the district court's denial of summary judgment on these grounds is instead "tentative, informal or incomplete." *Id.* at 42 (citing *Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 546 (1949)). Any "erroneous ruling on liability may be reviewed effectively on appeal from final judgment." *Id.* at 43.

Moreover, we lack jurisdiction to hear the claim under the doctrine of pendent appellate jurisdiction. "Pendent appellate jurisdiction may exist where, in the interest of judicial economy, courts have discretion to review interlocutory rulings related to independently appealable orders when the two

are 'inextricably intertwined.'" *Byrum v. Landreth*, 566 F.3d 442, 449 (5th Cir. 2009) (citing *Swint*, 514 U.S. at 43–44, 51).  But these claims are not so inextricably intertwined that the court should exercise pendent appellate jurisdiction.  Himes and Robinson must prove a different set of facts to show that they are not liable as final decisionmakers than they must prove to show they enjoy qualified immunity from suit.

Finally, policy considerations do not favor granting pendent appellate jurisdiction here.  Pendent appellate jurisdiction would not serve the interests of judicial economy, because common factual and legal issues will not necessarily be resolved by the qualified-immunity appeal.  In fact, the court should be especially wary of granting jurisdiction here for fear of allowing parties to "parlay . . . collateral orders into multi-issue interlocutory appeal tickets." *Swint*, 514 U.S. at 49–50; *see also Jamie S. v. Milwaukee Pub. Sch.*, 668 F.3d 481, 492 (7th Cir. 2012) (chiding appellants for using pendent appellate jurisdiction as a "bootstrapping procedural maneuver").

## III.  STANDARD OF REVIEW

Our court does not conduct a typical *de novo* review for an interlocutory appeal of a denial of summary judgment on qualified immunity grounds.  *See Kinney*, 367 F.3d at 348 (explaining that the court does "not apply the standard of Rule 56").  We "instead consider only whether the district court erred in assessing the legal significance of the conduct that the district court deemed sufficiently supported for purposes of summary judgment." *Id.*  "Where factual disputes exist in an interlocutory appeal asserting qualified immunity, we accept the plaintiff['s] version of the facts as true." *Id.*  But "[i]n reviewing the district court's conclusions concerning the legal consequences—the materiality—of the facts, our review is of course *de novo.*" *Id.* at 349 (citation omitted).

No. 13-40685

## IV.  DISCUSSION

To overcome an official's qualified immunity defense, a plaintiff must show that the evidence, viewed in the light most favorable to him, is sufficient to establish a genuine dispute "(1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al–Kidd*, 131 S. Ct. 2074, 2080 (2011); *see also Haverda v. Hays Cnty.*, 723 F.3d 586, 598 (5th Cir. 2013).  We have discretion to decide which of the two steps of qualified immunity to address first. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).[2]

"[T]he First Amendment protects a public employee's right, in certain circumstances, to speak as a citizen addressing matters of public concern." *Garcetti v. Ceballos*, 547 U.S. 410, 417 (2006).  To determine whether an employee's right has been violated, we first ask a threshold question: Was the employee's speech made pursuant to the employee's duties or as a citizen on a matter of public concern? *See id.* at 418 ("The first [step] requires determining whether the employee spoke as a citizen on a matter of public concern."); *see also Davis v. McKinney*, 518 F.3d 304, 312 (5th Cir. 2008) (discussing the new test in light of *Garcetti*).  Second, if the employee was speaking "as a citizen, in

---

[2] Defendants suggest an alternative statement of the two steps, under which we first determine "whether the plaintiff has alleged a violation of a *clearly established* constitutional or statutory right," and second determine "whether the defendant's conduct was objectively reasonable." *Wyatt*, 718 F.3d at 502–03 (citing *Jones v. City of Jackson*, 203 F.3d 875, 879 (5th Cir. 2000)).  We reject that suggestion.

   *Wyatt*'s two-prong test at best represents an adequate formulation of the second step of the qualified immunity test the Supreme Court recently restated in *al–Kidd*.  Even so, this formulation is awkward to apply.  "Clearly established law" is inextricably intertwined with the concept of "objective reasonableness": law is clearly established if it puts an objectively reasonable official on fair warning that his conduct is unlawful.  *See Kinney*, 367 F.3d at 349.  At worst, the *Wyatt* test ignores each court's discretion to answer the first step—whether the plaintiff has made out a violation of a constitutional or statutory right—*irrespective* of whether that right is clearly established.  *See Pearson*, 555 U.S. at 236 (noting that consideration of the first step is "often beneficial," even where the law is not clearly established).

commenting upon matters of public concern," we balance the employee's speech interest with the government employer's interest "in promoting the efficiency of the public services it performs." *Lane v. Franks*, 134 S. Ct. 2369, 2377 (2014) (quoting *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968)); *see also Juarez v. Aguilar*, 666 F.3d 325, 332 (5th Cir. 2011) (summarizing this second step as a four-prong test for First Amendment retaliation).[3]

The Supreme Court has recognized that in applying this test, a dispute sometimes arises as to "the factual basis for applying the test," that is, "what the speech was, in what tone it was delivered, [and] what the listener's reactions were." *Waters v. Churchill*, 511 U.S. 661, 668 (1994) (plurality opinion).[4] Rather than having the judicial factfinder independently resolve these factual disputes, the *Waters* Court instructed lower courts to take a deferential approach: when an employer's decision rests on a reasonable belief about the contents of the speech, formed after an objectively reasonable investigation of the facts to determine what the employee actually said, then the court should not second-guess the employer's decision, even if the employer was wrong and the speech was entitled to protection. *Id.* at 677–78.

### A.    Violation of a Constitutional Right

Before the district court, the Defendants conceded that Cutler had suffered an adverse employment decision and that Cutler's speech had

---

[3] A First Amendment retaliation claim also must show that the employer took an adverse employment action and the speech motivated the employer's conduct. *See, e.g.*, *Juarez*, 666 F.3d at 332. Those elements are not at issue here, and we do not discuss them.

[4] Although Justice O'Connor only wrote for a plurality of the Court, as Justice Souter wrote in a concurring opinion, "the reasonableness test [the opinion] sets out is clearly the one that lower courts should apply. A majority of the Court agrees that employers whose conduct survives the plurality's reasonableness test cannot be held constitutionally liable." *Id. at* 685 (Souter, J., concurring) (citing the plurality opinion and Justice Scalia's opinion concurring in the judgment, joined by Justice Kennedy and Justice Thomas).

motivated their conduct. Defendants also did not raise any arguments regarding the crucial *Pickering* balancing test. As a result, the district court stated that the only issue before it was "whether Cutler spoke as a citizen on a matter of public concern or as an official pursuant to his duties." It concluded that Cutler had presented sufficient evidence to create a genuine factual dispute on this element.

On appeal, the Defendants effectively abandon any argument that Cutler has not sufficiently established a genuine dispute whether the Defendants violated his constitutional right. Therefore, we must assume that Cutler has alleged a violation of his First Amendment right and proceed to the second step of the qualified immunity analysis.

## B.    Clearly Established Law

The Defendants raise two principal challenges to the district court's conclusion that Cutler's right was clearly established such that the Defendants had fair warning that their conduct was objectively unreasonable. First, the Defendants contend that, in 2010, the First Amendment right to be free from retaliation for protected speech was too abstract or general to give them fair warning that their conduct was objectively unreasonable. Second, the Defendants argue that it was not clearly established that their investigation into the content of Cutler's communications with Rep. Gohmert's office was unreasonable and thus entitled to no deference.

For a law to be "clearly established," the law must so clearly and unambiguously prohibit an official's conduct that "every reasonable official would have understood that what he is doing violates that right." *al-Kidd*, 131 S. Ct. at 2083 (internal quotation marks omitted). The court does not need to have "a case directly on point." *Id*. Rather, "existing precedent must have placed the statutory or constitutional question *beyond debate*." *Id*. (emphasis

No. 13-40685

added).  What is crucial is that the Defendants had "fair warning."  *Hope v. Pelzer,* 536 U.S. 730, 741 (2002).

### 1. *Speech as a Citizen After* Garcetti

Neither the parties nor the district court paints an accurate picture of "the landscape of [Fifth] Circuit precedent" at the time of the Defendants' actions.  *Lane*, 134 S. Ct. at 2382.  The Defendants argue that our holding in *Morgan v. Swanson*, 659 F.3d 359 (5th Cir. 2011) (en banc), should apply with equal force to this case.  In *Morgan,* the en banc court addressed a student's First Amendment claim against educators relating to candy canes with religious references at school—invoking the balance between free speech rights and the Establishment Clause.  *See* 659 F.3d at 379–82.  The court granted the school officials qualified immunity because

> the general state of the law in this area is abstruse, complicated, and subject to great debate among jurists.  At the time of the incidents in question, neither a single "controlling authority" nor a "robust consensus of persuasive authority" had held that the First Amendment prohibits school principals from restricting the distribution of written religious materials in public elementary schools.

*Id.* at 382.  Despite reciting the *Morgan* court's conclusion, the Defendants do not explain how the law in the present case presents similar difficulties.

Cutler insists that the district court correctly stated the clearly established law.  Yet, the district court relies on a single case for establishing a clearly established right.  *See Cutler v. Pattillo*, No. 2:11-CV-00447, 2013 WL 2543059, at *4 (E.D. Tex. June 10, 2013) ("[I]t was clearly established law that taking adverse-employment action against an employee for political reasons violates the First Amendment." (citing *Correa v. Fischer*, 982 F.2d 931, 933 (5th Cir. 1993))).  The district court appears to cite *Correa* for its holding that "termination of employees for political reasons is presumptively violative of the

11

First Amendment." 982 F.2d at 933. But *Correa* dealt with a patronage dismissal, unlike this case. *Correa* requires proof of elements unnecessary for a general First Amendment retaliation claim, namely, that the official conduct against the employee was taken "for political reasons." *Id.* Alternatively, Cutler proposes that we should look no further than *New York Times Co. v. Sullivan,* 376 U.S. 254, 269–71 (1964), for the clearly established law. The soaring rhetoric and historical sweep of that opinion's First Amendment statement run headlong into *al-Kidd*'s repudiation of overly abstract articulations of law. *See al-Kidd,* 131 S. Ct. at 2084.

A better place to start the examination of "clearly established law" is the First Amendment retaliation standard, as it has been consistently applied since *Garcetti.* In *Garcetti,* a deputy district attorney reported to his supervisor that there were inaccuracies in an affidavit supporting a search warrant and recommended that the office refrain from prosecuting the case. *See* 547 U.S. at 413–14, 421. The deputy alleged that he was subjected to a series of retaliatory actions in response to this intra-office speech. *Id.* at 414. The Supreme Court concluded that the deputy's speech was not entitled to First Amendment protection because it was made pursuant to his official duties, specifically in fulfillment of his responsibility to advise his supervisor about how best to proceed with a pending case. *Id.* at 421–23.

Yet, *Garcetti* alone may not "clearly establish" Cutler's First Amendment right. *Garcetti* did not "articulate a comprehensive framework for defining the scope of an employee's duties in cases where there is room for serious debate." *Id.* at 424. After all, *Garcetti* "did not explicate what it means to speak pursuant to one's official duties, although we do know that a formal job description is not dispositive . . . [,] nor is speaking on the subject matter of

one's employment." *Williams v. Dall. Indep. Sch. Dist.*, 480 F.3d 689, 692 (5th Cir. 2007) (per curiam) (citations and internal quotation marks omitted).

Several pre-2010 decisions have, however, given the Defendants the "fair warning" they need. This circuit began the task of embroidering *Garcetti*'s general rule with new fact patterns in 2007 in *Williams*. There, the court considered whether a memorandum sent by a school athletic director to a school principal about the misuse of athletic funds was official speech. *Id.* at 689–91. It was undisputed that the director was not required to write memoranda as part of his regular job duties, but the court nonetheless held that his speech was made pursuant to his official duties. *Id.* at 693–94. The court reasoned that "[a]ctivities undertaken in the course of performing one's job are activities pursuant to official duties." *Id* at 693. The memorandum concerned matters immediately within the athletic director's purview—the use of funds for the school athletic teams and the related accounting procedures. Thus, the speech was made as part of his official duties. *Id.* at 694.

In *Davis,* the court held that an information systems auditor spoke *in part* as a citizen on a matter of public concern when she sent reports to the EEOC, FBI, and university officials seeking investigation into complaints she made while working for the University of Texas system. 518 F.3d at 307–18. Davis worked for the University of Texas Health Science Center in Houston, and she conducted an audit of university computers and discovered pornography. *Id.* at 307–08. Davis approached various administrators to address the issue, but she considered their response to be inadequate. *Id.* at 308–09. She sent a complaint letter to her immediate supervisors and to the Chancellor, in which she noted that she had also filed complaints with the FBI regarding possible child pornography and the EEOC about workplace discrimination. *Id.* at 309, 314. *Davis* analyzed the issue based on whether

the speech was directed to internal chains of command or externally and whether the content of the speech was about job concerns or not. *See id.* at 313–16. Since Davis's complaints to the FBI and EEOC were clearly made outside of the chain of command and her duties as an auditor did not require that she communicate with law enforcement, the court held that the complaints constituted citizen speech. *Id.* at 316.

Similarly, in *Charles v. Grief*, 522 F.3d 508 (5th Cir. 2008), this court found that a member of the Texas Lottery Commission spoke as a citizen when he sent an email to members of the Texas Legislature as well as high-ranking Lottery Commission officials raising concerns about racial discrimination and retaliation against him and other minority employees of the Commission. *Id.* at 510. There the court considered the fact that the speech "was not made in the course of performing or fulfilling his job responsibilities, was not even indirectly related to his job, and was not made to higher-ups in his organization . . . but was communicated directly to elected representatives of the people." *Id.* at 514.

These cases should have provided Defendants with a clear warning that terminating Cutler on the basis of his speech to Rep. Gohmert's office—based on the undisputed facts and taking all reasonable inferences in Cutler's favor— would violate Cutler's First Amendment right. Assuming that Cutler's account of his conversations with Rep. Gohmert's office is credible, as we must do, Cutler's speech was made externally to a staff member of an "elected representative[] of the people" allegedly about participating in an event that was not within his job requirements. *See id.* Cutler spoke about concerns entirely unrelated to his job and from a perspective that did not depend on his job as a university employee, but rather emanated from his views as a citizen. *See Williams*, 480 F.3d at 693–94. Therefore, reasonable officials in the

14

No. 13-40685

Defendants' position should have known on the basis of *Charles* and *Davis* that Cutler's speech was protected as the speech of a citizen and that their decision to terminate Cutler on the basis of that citizen speech would violate Cutler's First Amendment right.

### 2.     *Reasonable Investigation Under* Waters

Next, the Defendants argue that reasonable officials in their positions would not have known that, under the circumstances, their investigation was an unreasonable one.  We hold that the law of this circuit clearly established what a reasonable investigation was such that a reasonable official would have known that the Defendants' investigation was unreasonable under the circumstances.

The district court found that there was a material fact issue as to whether the investigation was reasonable.  The district court found that Cutler had presented evidence that the Defendants ignored Cutler's explanations of the incident and focused inordinately on the University's relationship with Rep. Gohmert.  The court cited evidence that Berry had directed Himes to fire Cutler before Cutler had even spoken to Berry, that Himes admitted that he "could see where [Cutler] would feel that [he was being railroaded]" and Himes's admission that though "some sort of investigation" would normally occur after such an incident, "there wasn't any investigation [here] per se." Taking these facts as true and drawing all reasonable inferences in Cutler's favor, the Defendants could not have thought that their informal decisionmaking over the course of three days was a reasonable investigation to which our court would accord deference.

What constitutes a reasonable investigation prior to terminating a public employee for speech that is likely protected is beyond debate in our circuit.  In *Salge v. Edna Independent School District*, 411 F.3d 178 (5th Cir. 2005), our

court examined what a minimally adequate investigation had to include. The court surveyed our precedent applying *Waters* and concluded that the employer's "*de minimis*" investigation "fell far short of any investigation that we have ever held to be reasonable." *Id.* at 193. The court compared the circumstances of that case to the investigation in *Johnson v. Louisiana*, 369 F.3d 826 (5th Cir. 2004), in which our court found that the employers had conducted a reasonable investigation. *Id.* (citing *Johnson*, 369 F.3d at 832–33). In *Johnson*, the court relied on the fact that "(1) [the employer] received statements from three employees, (2) . . . obtained a supervisor's report stating that the supervisor believed that the plaintiff was lying, and (3) the plaintiff 'fail[ed] to present *any* evidence in his own support even when explicitly invited to do so.'" *Id.* (quoting *Johnson*, 369 F.3d at 832). The court also summarized the investigation in *Waters*:

> [T]he investigation approved by the Supreme Court comprised the employer (1) thrice interviewing the employee who originally complained about Churchill's speech, (2) questioning another employee who had witnessed the conversation for corroboration, and (3) most significantly, conversing with the employee whose speech was at issue. Although the Court noted that the employer had not interviewed the plaintiff before telling her that she was fired, it relied on the fact that, after her discharge, the plaintiff filed an internal grievance and was afforded a meeting with the hospital president to tell her side of the story. And, even then, before making the plaintiff's employment termination final, the hospital conducted yet another interview with the employee who had originally complained about the plaintiff's speech and sought assurances of all employees' credibility from supervisors.

*Id.* (citing *Waters*, 511 U.S. at 666, 680). At the very least, the court suggested, "without at least asking an employee what she said, an employer's indispensable investigation into whether an employee's speech was protected will not be reasonable." *Id.*

16

No. 13-40685

Moreover, in each prior case, the pre-termination investigation the court has found reasonable was the product of written reports and involved routine procedural channels for investigation. In *Waters*, the Court noted that the plaintiff availed herself of internal grievance procedures, in the course of which decisionmakers had the opportunity to review "written reports" and conduct follow-up interviews. 511 U.S. at 666–67. In *Johnson*, the decisionmaker acted on an "investigative report" submitted to him by a subordinate, and the decisionmaker invited the plaintiff to "submit evidence" and other statements in support of his claims. 369 F.3d at 829. In *Salge*, by contrast, the decisionmaker made no report and compiled no evidence, and we held the investigation was unreasonable. 411 F.3d at 183, 194–95.

In sum, our court has made clear that reasonableness depends in part on an investigation's thoroughness and typically results from some formal process for reviewing evidence and weighing disputed claims. This is true even though *Waters* clearly stated that an investigation "need not be [conducted with] the care with which trials, with their rules of evidence and procedure, are conducted." 511 U.S. at 677–78; *cf. Gonzales v. Dall. Cnty.*, 249 F.3d 406, 412 (5th Cir. 2001) (granting qualified immunity because "the fact that [defendants] may have relied on hearsay or made credibility determinations . . . does not necessarily suggest that the decision to terminate . . . was unreasonable"). Still, the investigation has to be made according to "the care that a reasonable manager would use before making an employment decision— discharge, suspension, reprimand, or whatever else—of the sort involved in the particular case." *Waters*, 511 U.S. at 678. The Defendants are incorrect that all that was required of them was to "talk to the employee and talk to the direct witness to the speech at issue." Our circuit has made clear that more than just talking is required to conduct an investigation.

17

No. 13-40685

By this standard, taking the facts as Cutler has established, the Defendants here should have known that their investigation was woefully inadequate. Most importantly, unlike every other case, the Defendants prepared no report and operated according to an ad hoc process. The only written record before the court is Robinson's vague and incomplete notes of his conversation with Cutler. Based on Himes's statements, one could reasonably infer that the Defendants had regular investigative procedures available to them but chose not to use them. The Defendants conducted only two interviews, far fewer than in any case we have previously found reasonable. Based on our review of similar cases, we conclude that every reasonable official in the Defendants' positions would have known based on these cases that an informal, hastily concluded investigation would be unreasonable.

In addition, the Defendants' investigation was not conducted in good faith as is required by *Waters*. As the *Waters* Court stated, "It is necessary that the decisionmaker reach its conclusion about what was said in good faith, rather than as a pretext." 511 U.S. at 677. The district court found facts that suggest the Defendants' investigation was pretextual. The Defendants could not be said to be acting in good faith on the investigation, if, as the district court found, Berry had already concluded that the University should fire Cutler, before Berry had even spoken with Cutler. Evidence also suggests that Berry formed his termination decision based on past reports of Cutler's interactions with staff unrelated to his communications to Rep. Gohmert's office. Any reasonable official would know on the basis of *Waters* that an investigation that was pretextual could not be reasonable.

To be clear, this holding does not foreclose the Defendants from later proving that they are entitled to qualified immunity. Trial may resolve the central credibility determination: whose account of the content of Cutler's

18

conversations is correct. We only reach the conclusion that the law was clearly established based on the undisputed facts and accepting plaintiff's version of the facts that the district court found disputed. We lack jurisdiction to second-guess the district court's factual determinations at this early juncture.

Therefore, we hold that the district court did not err in finding that the law was "clearly established."

## V.  CONCLUSION

In conclusion, we affirm the district court's denial of summary judgment on qualified immunity grounds and dismiss all of Defendants' other claims.