# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

March 25, 2021

Lyle W. Cayce
Clerk

No. 20-50687

Amy Harrison,

*Plaintiff—Appellant*,

*versus*

Kevin Lilly, *Individually and in His Official Capacity*; Robert Saenz, *Individually and in His Official Capacity*,

*Defendants—Appellees*.

Appeal from the United States District Court
for the Western District of Texas
USDC No. 1:19-CV-668

Before Elrod, Willett, and Engelhardt, *Circuit Judges*.

Per Curiam:[*]

Amy Harrison sued Kevin Lilly and Robert Saenz in their individual and official capacities under 42 U.S.C. § 1983 ("Section 1983"), alleging that she was terminated in retaliation for exercising her First Amendment right to

---

[*] Pursuant to 5th Circuit Rule 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5th Circuit Rule 47.5.4.

No. 20-50687

free speech. The district court dismissed Harrison's complaint for failure to state a claim, and she now appeals the dismissal. We AFFIRM.

I.

Before her termination on July 12, 2017, Amy Harrison worked as Licensing Director for the Texas Alcoholic Beverage Commission ("TABC"). Her job duties included supervising and running the TABC Licensing Department, which regulates the persons and entities who receive alcoholic beverage licenses in Texas.

In May 2017, Governor Greg Abbott appointed Kevin Lilly to serve as TABC Chairman. In preparation for his new role, Lilly attended a legally required training on conflicts of interest. One day in June 2017, Lilly contacted Harrison about his stock portfolio and requested her interpretation of a conflict-of-interest provision in the Texas Government Code. Harrison told Lilly that providing legal advice was beyond the scope of her position and recommended that he consult an attorney. Later that day, Lilly sent an email containing a list of his personal stock holdings to Harrison and TABC General Counsel Emily Helm.

Harrison compared Lilly's stock holdings to a list of companies licensed by TABC, discovered an overlap between the two, and concluded that Lilly had a possible conflict of interest in violation of Texas law. Harrison emailed her findings to TABC Executive Director Ed Swedberg, her direct supervisor. Harrison also emailed her findings to Helm, who was not a member of Harrison's official workplace chain of command. Harrison additionally discussed her findings with Lilly directly. After reviewing the information provided by Harrison, Helm emailed Lilly an outline of the reasons why his stock holdings might violate Texas law.

On June 30, Harrison learned that TABC might be planning to fire her. Harrison met with Swedberg, who informed her that she could work

No. 20-50687

through August 2017 and then retire. Harrison told Swedberg she had not planned on retiring at that time. On July 6, Swedberg and TABC Chief of Field Operations Robert Saenz held a conference call with Harrison. Saenz stated that if Swedberg did not fire Harrison, then Saenz would take Swedberg's position and fire her himself. On July 7, Harrison informed Swedberg that she would not be retiring. Unwilling to fire Harrison, Swedberg resigned on July 10. On July 11, Lilly named Saenz TABC Acting Executive Director. On July 12, Harrison was summoned to a meeting with Saenz and TABC Human Resources Director Donald Rupp. At this meeting, Harrison reiterated her findings about Lilly's possible conflict of interest. Saenz and Rupp then fired Harrison, explaining that Lilly "wanted to go in a different direction."

Harrison brought a claim for First Amendment retaliation pursuant to Section 1983 against Lilly and Saenz (collectively "Defendants") in their individual and official capacities. She alleged that Defendants terminated her in retaliation for communicating her conclusions regarding Lilly's potential legal violation. Defendants filed a Rule 12(b)(6) motion to dismiss, arguing that Harrison failed to state a First Amendment retaliation claim. In the alternative, Defendants argued that they were entitled to qualified immunity for their actions in terminating Harrison. Without reaching the qualified immunity issue, the district court granted Defendants' motion, concluding that Harrison failed to state a First Amendment cause of action. Specifically, the district court found that Harrison alleged that her communications about Lilly's potential legal violation were made as an employee—not as a citizen— thus disqualifying her speech from First Amendment protection under *Garcetti v. Ceballos*, 547 U.S. 410 (2006). This appeal followed.

## II.

We review de novo a district court's order granting a Rule 12(b)(6) motion to dismiss. *IberiaBank Corp. v. Ill. Union Ins. Co.*, 953 F.3d 339, 345 (5th Cir. 2020). All well-pleaded factual allegations are accepted as true and viewed in the light most favorable to the plaintiff. *Alexander v. Verizon Wireless Servs., L.L.C.*, 875 F.3d 243, 249 (5th Cir. 2017) (citation omitted).

## III.

Harrison argues that the district court erred in finding that her complaint failed to allege the citizen speech required to state a First Amendment cause of action under *Garcetti*. She contends that she has pled citizen speech based on allegations that her communications regarding Lilly's potential legal violation had no relation to her official duties as Licensing Director and were made to Helm—a TABC employee outside her workplace chain of command.

To establish a Section 1983 claim for employment retaliation related to speech, a public employee must allege that "(1) he suffered an adverse employment action; (2) he spoke as a citizen on a matter of public concern; (3) his interest in the speech outweighs the government's interest in the efficient provision of public services; and (4) the speech precipitated the adverse employment action." *Anderson v. Valdez*, 845 F.3d 580, 590 (5th Cir. 2016) (citation omitted). As the district court found in the present case, failure to allege the second prong is fatal to a First Amendment retaliation claim, because an employee who does not speak "as a citizen on a matter of public concern . . . has no First Amendment cause of action based on his or her employer's reaction to the speech." *Garcetti*, 547 U.S. at 418.

As a threshold inquiry, we must determine whether the employee spoke as a private citizen or pursuant to her public job before asking whether the subject matter of the speech is a topic of public concern. *Davis v.*

*McKinney*, 518 F.3d 304, 312 (5th Cir. 2008); *see also Charles v. Grief*, 522 F.3d 508, 512 (5th Cir. 2008) ("Before proceeding to examine the substance of [the employee's] speech, we must first focus on his role when he uttered it.").

"[W]hen public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Garcetti*, 547 U.S. at 421. "Official duties" are tasks that employees are required to perform as part of their job responsibilities. *Id.* at 421–22. Because the employee in *Garcetti* did not dispute that his speech was required under his official duties, the Supreme Court declined "to articulate a comprehensive framework for defining the scope of an employee's duties in cases where there is room for serious debate." *Id.* at 424. It further noted that the following factors, while relevant, are not dispositive in determining whether a public employee's speech is within the scope of his official duties: whether a certain task is listed in a formal job description, whether the speech concerns the subject matter of employment, and whether the speech occurs inside the office. *Id.* at 420–21, 424–25.

Picking up where *Garcetti* left off, we have found unprotected employee speech in situations where the speech at issue is not explicitly required under the employee's official duties but nonetheless is related to those duties. We held that a school athletic director who submitted internal memoranda to his principal accusing the school of athletic budget mismanagement engaged in unprotected employee speech, because his speech focused on his "daily operations," reflected "special knowledge" gleaned from his position, and was "part-and-parcel of his concerns" in running the school's athletic department. *Williams v. Dall. Indep. Sch. Dist.*, 480 F.3d 689, 690–91, 694 (5th Cir. 2007). We also found that a university audit manager who submitted an internal complaint to her superiors accusing

No. 20-50687

the university of mishandling an audit investigation engaged in unprotected employee speech, because her statements related to her "core job description" and were "directed within [her] chain of command." *Davis*, 518 F.3d at 315.

On the other hand, we held that the *Davis* audit manager engaged in protected citizen speech by filing complaints with the EEOC and FBI alleging employment discrimination at the university and discovery of possible child pornography on university computers, because communicating with external law enforcement authorities or agencies was unrelated to her official duties. *Id.* at 316 (conditioning this holding to a finding on remand that the speech raised matters of public concern). We also found that a systems analyst for the Texas Lottery Commission engaged in citizen speech when he emailed complaints about employment discrimination in his workplace to Texas legislators, because his communications were "not even indirectly related to his job" and he bypassed his "normal chain of command" by communicating externally to elected representatives rather than internally to his supervisors. *Charles*, 522 F.3d at 514. Additionally, we have held that a university art director engaged in protected citizen speech by expressing his political views to a congressman's staff member, because he "spoke about concerns entirely unrelated to his job and from a perspective that did not depend on his job . . . but rather emanated from his views as a citizen." *Cutler v. Stephen F. Austin State Univ.*, 767 F.3d 462, 473 (5th Cir. 2014).

Accepting all of Harrison's allegations as true, a Licensing Director had no "official duty" to provide legal advice or report a co-worker's suspected legal violations. *Cf. Garcetti*, 547 U.S. at 421–22. However, Harrison alleged that she only reached her conclusions about Lilly's potential legal violation after receiving Lilly's list of stock holdings in a workplace email, applying her licensing knowledge to compare TABC licensees to companies in which Lilly held stock, and identifying TABC licensees that

overlapped with those companies—all tasks related to her "core job description" and "daily operations" of running the Licensing Department and regulating TABC licensees. *Davis*, 518 F.3d at 315; *Williams*, 480 F.3d at 694. Indeed, Harrison's briefing does not dispute that a Licensing Director's official duties include informing others of the identities of TABC licensees. Because the performance of her official duties formed the very basis for her communications about Lilly's potential legal violation, her speech was "part-and-parcel" of her concerns as Licensing Director. *Williams*, 480 F.3d at 694. Further, Harrison's communications did not "emanate[] from [her] views as a citizen," but rather originated from her perspective as Licensing Director, because she would not have noticed the overlap giving rise to her legal concerns without her licensing expertise and workplace access to a list of Lilly's stock holdings. *Cf. Cutler*, 767 F.3d at 473.

Harrison's communications were further premised on "special knowledge" gleaned from her position. *Williams*, 480 F.3d at 694. Harrison's allegations indicate that she knew the companies in which Lilly held stock, knew which companies held TABC licenses, and knew there was a legally suspicious overlap between the two precisely because she was Licensing Director. Even assuming that the identities of TABC-licensed companies are publicly available, the same cannot be said of Lilly's stock holdings, which were listed in a workplace email that Harrison received in her employee capacity.

Finally, Harrison's complaint alleges that her communications to Helm were made outside her workplace chain of command. In the First Amendment retaliation context, we have found citizen speech in situations where an employee speaks outside her chain of command; however, these cases involved employees who communicated with persons or agencies outside the workplace on topics unrelated to their official duties. *Davis*, 518 F.3d at 316; *Charles*, 522 F.3d at 514; *Howell v. Town of Ball*, 827 F.3d 515,

524 (5th Cir. 2016) (police officer's communications with FBI regarding investigation into fraud scheme perpetrated by city employees). Harrison's case is distinguishable from *Davis*, *Charles*, and *Howell* because Helm was Harrison's fellow TABC employee—not an external party—and Harrison's communications to Helm were related to her official duties as Licensing Director.

Moreover, Harrison's factual allegations indicate that Helm was within Harrison's workplace chain of command at the time of the events giving rise to her retaliation claim. Harrison alleged that after Lilly learned that Harrison was not qualified to provide legal advice on conflicts of interest, he copied Harrison and Helm on an email listing his personal stock holdings. As stated above, Harrison does not dispute that informing others of who holds a TABC license is within the scope of a Licensing Director's official duties. As a practical matter, Helm could not perform legal analysis of Lilly's potential conflicts of interest without first knowing which TABC licensees, if any, overlapped with Lilly's stock holdings. Indeed, Harrison alleged that after she provided Helm with information on the overlapping entities, Helm legally reviewed this information and emailed Lilly an outline of the reasons why his stock holdings might violate Texas law. Thus, the complaint shows that Lilly placed Harrison within Helm's chain of command—at least for purposes of responding to his stock-portfolio email—so that Harrison could contribute her licensing expertise and streamline Helm's legal analysis.

For the foregoing reasons, Harrison's complaint alleged that her communications regarding Lilly's potential legal violation related to her official duties as Licensing Director, reflected special knowledge gleaned from her position, and were made up the chain of command. Accordingly, we find that Harrison's complaint alleges that she spoke as Licensing Director—not as a citizen. Harrison's failure to allege citizen speech is fatal to her First Amendment cause of action. *Garcetti*, 547 U.S. at 418. Thus, the district

No. 20-50687

court did not err in dismissing Harrison's case for failure to state a claim under Rule 12(b)(6).[1]

## IV.

For the foregoing reasons, we AFFIRM the district court's grant of Defendants' Rule 12(b)(6) motion to dismiss.

---

[1] Because Harrison failed to allege facts to satisfy *Garcetti*'s threshold inquiry that she be speaking as a citizen, we need not address whether she alleged speech on a matter of public concern. *See Davis*, 518 F.3d at 312; *see also Charles*, 522 F.3d at 512. In addition, based on Harrison's failure to state a First Amendment retaliation claim, we need not address Defendants' qualified immunity defense.